Sharon **DRENNAN**, Individually and on Behalf of Her Minor Daughter, Amy Lytal, Appellant,

v.

**COMMUNITY HEALTH INVESTMENT CORPORATION, et al., Appellees.**

No. 07–94–0053–CV.

Court of Appeals of Texas, Amarillo.

Aug. 31, 1995.

Rehearing Overruled Sept. 29, 1995.

4. *Gannon*, 706 S.W.2d at 307.

The Bratton Firm, Bonnie Bratton, Austin, for appellant.

Jones, Flygare, Galey, Brown & Wharton, John A. Flygare, Lubbock, Friend & Associates, LLP, Gail N. Friend and Martha R. Campbell, Houston, for appellees.

Small Craig & Werkenthin PC, Carla J. Cox, Austin, Powers & Hall, Gene A. Blumenreich and Marc C. Laredo, Boston, MA, amici curiae.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

## ON MOTION FOR REHEARING

REYNOLDS, Chief Justice.

In our 18 May 1995 original opinion, we articulated the reasons why we affirmed the take-nothing summary judgment rendered in the action brought by Sharon Drennan, individually and on behalf of her minor daughter, Amy Lytal, against Community Health Investment Corporation, C.H.S. Management Corporation d/b/a Highland Medical Center (the Hospital); Owen Health Care, Inc., individually and d/b/a Highland Medical Center Pharmacy; and Todd Dipprey, registered pharmacist. To additionally address concerns expressed by Drennan in her motion for rehearing, we withdraw our original opinion, overrule the motion for rehearing, and issue this opinion to explain the affirmance of the trial court's judgment.

The intricacies of the underlying action necessitate a recitation of the events and proceedings leading to this appeal. The events began with Amy Lytal's need for surgery. Amy had been in the care of John P. Theo, M.D., an orthopedic surgeon, for treatment of scoliosis since 25 June 1986, and in 1990, Dr. Theo recommended the placement of rods in her back to correct the curvature of her spine.

It is undisputed that all arrangements for the surgery were made by Dr. Theo from his office, outside the Hospital's premises, but the surgery was to be conducted using the Hospital's facilities. It was in his office that Dr. Theo explained to Drennan the need for the surgery and the procedures necessary to accomplish it, including placing Amy under general anesthesia. Drennan understood that Amy would be completely asleep, but she did not ask who would be administering the anesthesia.

For the preceding ten years, Dr. Theo had worked with Ben Harman, a certified registered nurse anesthetist (CRNA), in performing surgeries. Dr. Theo believed Harman to be qualified to put Amy to sleep for the surgery, and arranged, from his office, to engage Harman's services. Prior to her admission to the Hospital's facilities, Hal Green, M.D., an internist, examined Amy and gave clearance for her surgery.

Todd Dipprey, a registered pharmacist, operated the branch of Owen Health Care, Inc., doing business as Highland Medical Center Pharmacy,[1] on the Hospital's premises, where it maintained its floor stock.[2] The Pharmacy provided summary judgment evidence that (1) it was not a pharmacy open to the public; (2) despite the name and its

---

1. References herein to the Pharmacy are collectively to Owen Health Care, Inc., individually and d/b/a Highland Medical Center Pharmacy, and Todd Dipprey, unless otherwise indicated.

2. "Floor stock" is defined as "prescription drugs or devices not labeled for a specific patient and maintained at a nursing station or other hospital department (excluding the pharmacy) for the purpose of administration to a patient of the facility." 22 Tex.Admin.Code § 291.72 (West 1995) (Texas State Board of Pharmacy).

location on the Hospital's premises, it was associated with the Hospital only by a business relationship; and (3) Todd Dipprey was not an employee of the Hospital, but of Owen Health Care, Inc.

On 20 March 1990, Amy was admitted to the Hospital's facilities for her scheduled surgery. Based upon Dr. Theo's order for "general anesthesia," and in accordance with his customary practice, Harman procured Sodium Pentothal and Atracurium from the floor stock of the Pharmacy.

Drennan's sister, Sandra Lytal, recalled Harman coming to Amy's room and explaining he would be putting her to sleep, and asking if there were any questions he could answer. Harman was not asked whether, nor did he volunteer that, he was a CRNA and not a medical doctor.

Present at Amy's surgery were Harman; Dr. Theo and his assistant, Wesley R. Strahan, M.D.; Armondo Lopez, a scrub technician; Rick Boratia, who monitored Amy's spinal cord; and an unidentified woman assisting Boratia. Harman administered the Sodium Pentothal and Atracurium, and placed Amy under general anesthesia.

As the surgery progressed, Harman monitored Amy's vital signs and, upon noticing a cardiac arrhythmia, asked Dr. Theo to stop the surgery. Harman first administered Adrenalin and Lidocaine, then administered cardio pulmonary resuscitation until her heart rhythms converted to normal patterns. The surgery was aborted.

Amy had an adverse reaction to the Atracurium, which Dr. Theo, believed to be unforeseeable because she was a "healthy adolescent in whom there should have been no problem." Nevertheless, the operating room events resulted in neurological damage to Amy.

Alleging negligence in the administration of anesthesia, Drennan filed her sixth amended petition in January of 1992, against Dr. Theo, Dr. Strahan, Harman, Dr. Green, Dr. Ivan Barber, and C.H.S. Management Corporation d/b/a Highland Medical Center.

Doctors Strahan and Green were later dismissed from the suit upon Drennan's decision not to pursue any action against them. Harman and Dr. Theo entered into settlement agreements with Drennan, which are not made part of the record before us. Doctor Ivan Barber, the anesthesiologist who served as the medical staff chief of anesthesia, moved for and was granted summary judgment.

By her eighth amended original petition, Drennan added the Pharmacy to the list of defendants. At the same time, she also modified her pleadings to restyle her action against C.H.S. Management Corporation d/b/a Highland Medical Center as being against "Community Health Investment Corporation, formerly known as C.H.S. Management Corporation and formerly known as Community Health Systems of Texas, individually and d/b/a Highland Medical Center; C.H.S. Management Corporation d/b/a Highland Medical Center." The Hospital maintained at trial, and maintains on appeal, that Community Health Investment Corporation was an improper party.

The Hospital and the Pharmacy separately moved for summary judgment on the allegations contained in Drennan's eighth amended original petition, which is not found in the record before this Court. Subsequent to the filing of the motions, Drennan filed her tenth amended original petition, wherein she alleged negligence and, for the first time, negligence per se in the dispensing of Atracurium to Harman, and violations of the Texas Deceptive Trade Practices Act (DTPA).[3] Drennan based her cause of action against the Hospital on the imputation of the negligence and negligence per se of Dr. Theo, Dr. Barber, Harman, and the Pharmacy, and further alleged that all were engaged in a joint enterprise. The focus of her cause of action against the Pharmacy was the per se negligence of dispensing the drugs to Harman.

The Hospital countered by filing its first and second amended motions for summary judgment, alleging there was no employment,

**3.** References herein to the DTPA are to the Texas Deceptive Trade Practices—Consumer Protection Act, Texas Business & Commerce Code Annotat- ed, section 17.41 *et seq.* (Vernon 1987 & Supp. 1995).

nor any joint enterprise, relationship between it and any of the remaining defendants. Furthermore, the Hospital alleged, Drennan was statutorily precluded from bringing a cause of action under the DTPA because, first, the action was barred by limitations, and second, the Hospital was excluded from liability for DTPA actions founded on allegations of negligence. Finally, the Hospital alleged that all actions by it, as well as Harman and Dr. Theo, were in accordance with governing statutes. The Hospital concluded Drennan had failed to state a cause of action against it.

By its motion for summary judgment, the Pharmacy alleged that Dipprey was solely the employee of Owen Health Care, Inc., not the Hospital, it was not involved in any joint venture, and that it had complied with all governing statutes in relation to dispensing drugs to Harman. Further, the Pharmacy contended that Drennan's DTPA cause of action was barred by limitations.

Drennan filed a sizable response to the motions, tendering one hundred and fifty-two pages exclusive of exhibits. However, her response, dedicated to refutation of the motions, included the deposition testimony of Dr. Evan Krantz, a board certified anesthesiologist, and the affidavit of Michael Petry, a pharmacist.

Without stating the grounds for its reasoning, the trial court granted summary judgment in favor of "Community Health Investment Corporation, C.H.S. Management Corporation d/b/a Highland Medical Center (improperly identified as C.H.S. Management Corporation, formerly known as Community Health Systems of Texas, Individually and d/b/a Highland Medical Center)," and the Pharmacy. From the judgment, Drennan perfected this appeal, contending with a single point of error that the trial court erred in rendering summary judgment.

■ When it is not clear upon what basis the trial court granted summary judgment, it is sufficient to present, as Drennan has, a point of error that the trial court erred in granting the motion for summary judgment. *Malooly Brothers, Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex.1970). Drennan's broad contention of error is fragmented into ten sub-

points, by which she contends questions of material fact exist to vitiate the summary judgment. Drennan contends, as she did in her response to the motions, *accord City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979), that: (1) the Pharmacy committed negligence per se in dispensing a dangerous drug to a non-physician; (2–6) Dr. Theo, Harman, Dr. Barber and the Pharmacy were actual or ostensible agents of the Hospital, and even if not, the Hospital had some control over their work, thereby making the Hospital liable for their acts of negligence; (7) the Pharmacy, Dr. Theo, Dr. Barber, Harman, and the Hospital were engaged in a joint enterprise; and (8–10) she established a valid cause of action under the DTPA which was not barred by the statute of limitations. Drennan also presents an eleventh sub-point that Community Health Investment Corporation is a proper party to the suit. We will discuss Drennan's contentions in logical consecution.

■ In a summary judgment proceeding, the burden of proof is on the movant to show there exists no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Swilley v. Hughes*, 488 S.W.2d 64, 67 (Tex.1972). Once the movant has established a right to summary judgment, the nonmovant assumes the burden to present issues which would preclude summary judgment. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d at 678. The question on appeal is not whether the summary judgment proof raises a fact issue, but whether the summary judgment proof establishes as a matter of law there is no genuine issue of material fact concerning one or more of the essential elements of the plaintiff's cause of action. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex. 1970).

Because the trial court did not specify upon what ground or grounds the motions were granted, Drennan must establish that each independent ground presented in the Hospital's and the Pharmacy's motions for summary judgment is insufficient to support the judgment. *Insurance Co. of N. Am. v. Security Ins.*, 790 S.W.2d 407, 410 (Tex.

App.—Houston [1st Dist.] 1990, no writ). The judgment will be affirmed if any ground would have been successful. *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989); *Borg–Warner Acceptance Corp. v. C.I.T. Corp.,* 679 S.W.2d 140, 142 (Tex.App.—Amarillo 1984, writ ref'd n.r.e.).

■ Drennan's eleventh sub-point is occasioned because, by an initial footnote in its second amended motion for summary judgment, the Hospital stated, but did not contend as a ground for summary judgment, that Community Health Investment Corporation was an improper party. The statement was made on the theory that the cause of action arose on 20 March 1990, and Community Health Investment Corporation did not come into existence until 22 October 1991.

We have reviewed the Hospital's supporting evidence which, by its stated title, is an "Amended and Restated Certificate of Incorporation of CHS Management Corporation." Although the document has been redacted, its stated purpose is nothing more than to effect a change of the name of the corporation to "Community Health Investment Corporation" from "CHS Management Corporation." The entities are the same for liability purposes, *Northern Natural Gas Co. v. Vanderburg,* 785 S.W.2d 415, 421 (Tex.App.—Amarillo 1990, no writ), and the original certificate of incorporation was issued 19 July 1985, prior to the date the present controversy arose.

Consequently, the issue of the name change is immaterial to the correct disposition of the controversy underlying the summary judgment, and as such, will not defeat the summary judgment. *Borg–Warner Acceptance Corp. v. C.I.T. Corp.,* 679 S.W.2d at 144. Drennan's eleventh sub-point is sustained.

By her second through sixth presentations, Drennan contends summary judgment in favor of the Hospital was precluded by the existence of fact issues as to (1) whether Harman was negligent or negligent per se in administering the anesthesia, (2) whether doctors Theo and Barber were negligent in their supervision of Harman, (3) whether patients were allowed to choose who would put them to sleep under anesthesia, and (4)

whether the Pharmacy was negligent per se in dispensing the drugs to Harman. Answering, the Hospital claimed in the trial court, and claims on appeal, its entitlement to judgment as a matter of law because (1) it acted, as did Harman and the Pharmacy, in compliance with all controlling statutes; (2) there was no employment or agency relationship upon which to base the imputation of negligence and negligence per se; and (3) it had breached no direct duty to Drennan.

In connection with the presentation, we disagree with Drennan's assertion that the Hospital and the Pharmacy failed to address the issue of negligence per se in their motions for summary judgment. We read the discussion in both motions that the acts of all parties were in compliance with controlling statutes to be sufficient responses to the allegations of negligence per se.

■ When confronted with the Hospital's motion for summary judgment, Drennan, to raise a fact issue, was required to present proof by competent testimony that the negligence of the Hospital or its employees or agents caused Amy's injury. The testimony must have shown a causal connection beyond the point of conjecture. *Lopez v. Central Plains Regional Hosp.,* 859 S.W.2d 600, 604 (Tex.App.—Amarillo 1993, no writ). Liability of the Hospital exists only if Amy's injury proximately resulted from negligence by the Hospital or its employees. *See Harris Hospital v. Pope,* 520 S.W.2d 813, 815 (Tex.Civ.App.—Fort Worth 1975, writ ref'd n.r.e.).

■ It is the general rule that a hospital is not liable for the negligent acts or omissions of independent physicians. *Berel v. HCA Health Services,* 881 S.W.2d 21, 23 (Tex.App.—Houston [1st Dist.] 1994, no writ). This is so, because by definition, an independent contractor is not an employee. *Dumas v. Muenster Hosp. Dist.,* 859 S.W.2d 648, 651 (Tex.App.—Fort Worth 1993, no writ). Thus, it is not enough for Drennan to show that Amy was injured by the negligence or negligence per se of Dr. Theo, Dr. Barber, Harman, or the Pharmacy. She must have presented evidence to (1) impute that negligence to the Hospital under a theory of

respondeat superior, *Gladewater Municipal Hosp. v. Daniel,* 694 S.W.2d 619 (Tex.App.—Texarkana 1985, no writ), or ostensible agency, *Baptist Memorial Hosp. System v. Smith,* 822 S.W.2d 67 (Tex.App.—San Antonio 1991, writ denied); or (2) establish liability for a duty which the Hospital owed directly. *Medical & Surgical Memorial Hospital v. Cauthorn,* 229 S.W.2d 932 (Tex.Civ.App.—El Paso 1949, writ ref'd n.r.e.).

■ The affidavit testimony of Michael Kozar, the Hospital's administrator in 1990, was unequivocal that none of the defendants were employees of the Hospital, there were no contracts of employment, the Hospital did not bill for their services, and the Hospital had no authority to direct or control their practices. Harman and Dipprey stated in their affidavits that they were not employees of the Hospital.

Drennan did not bring forth any evidence in the record to contradict the testimony. *Compare, Mitchell v. Amarillo Hospital District,* 855 S.W.2d 857, 866 (Tex.App.—Amarillo 1993, writ denied), *cert. denied,* — U.S. ——, 115 S.Ct. 510, 130 L.Ed.2d 417 (1994) (although doctor by his deposition testified that he did not consider himself an employee of the hospital, the record evidenced an employment agreement), *with Lopez v. Central Plains Regional Hosp.,* 859 S.W.2d at 605 (doctor was independent contractor where record showed there was no contract between hospital and doctor, hospital had no authority to direct or control the doctor's practice, and did not bill or collect for the doctor's services to his patients), *and Nicholson v. Memorial Hosp. System,* 722 S.W.2d 746, 750 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (doctor was independent physician where no contractual relationship was evinced between him and hospital, doctor billed his clients directly and received no remuneration from the hospital). Consequently, she is not in a position to assert on appeal that there are unresolved material fact issues concerning the question whether the other defendants were employees of the Hospital. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d at 678.

Nevertheless, as we understand Drennan's assessment of her summary judgment proof,

she relies upon policies and procedures promulgated by the Hospital and its committees to support her theories of employment and control. We are not in agreement with her assessment.

■ That a doctor has staff privileges with a particular hospital and agrees to abide by certain policies and procedures while utilizing a hospital's facilities does not translate into an employment agreement. *See Gonzalez v. San Jacinto Methodist Hosp.,* 880 S.W.2d 436 (Tex.App.—Texarkana 1994, writ denied). A doctor chosen by a patient is considered an independent contractor with regard to hospitals at which he has staff privileges. *Jeffcoat v. Phillips,* 534 S.W.2d 168, 173 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.).

■ Even so, Drennan contends the Hospital maintained control over the work of Dr. Theo, Dr. Barber, Harman, and the Pharmacy. If an employer retains the right to control the details of the work to be performed by a contracting party, a master-servant relationship exists which will authorize the application of the rule of respondeat superior. *Newspapers, Inc. v. Love,* 380 S.W.2d 582, 585–86 (Tex.1964). It is the right of control, not actual control, that gives rise to a duty to see that the independent contractor performs his work in a safe manner. *Owens v. Litton,* 822 S.W.2d 794, 797 (Tex.App.—Houston [14th Dist.] 1992, writ denied).

■ Conversely, where an employer is interested only in the results, and the contracting party independently determines the details of the method by which the desired results are attained, an independent contractor relationship exists and the rule of respondeat superior does not apply. *Hamman v. Boaz Well Service, Inc.,* 620 S.W.2d 903, 904 (Tex.Civ.App.—Fort Worth 1981, no writ). Unless the evidence is conclusive and reasonably susceptible to only one inference, the question whether a person is an employee or an independent contractor is one of fact. *Dougherty v. Gifford,* 826 S.W.2d 668, 678 (Tex.App.—Texarkana 1992, no writ).

When the Hospital moved for summary judgment on this issue, it evidenced that Amy and Dr. Theo had an existing patient-physician relationship long before Drennan and the doctor agreed upon her admission to the Hospital on 20 March 1990. Furthermore, Dr. Theo arranged for Harman's services outside the parameters and facilities of the Hospital. Kozar's affidavit testimony was that the Hospital had no control over the details of Dr. Theo's work, and that he was an independent contractor.

Drennan offered no evidence to refute the Hospital's summary judgment evidence. There was no evidence of respondeat superior as to Dr. Theo. *Gladewater Municipal Hosp. v. Daniel,* 694 S.W.2d at 621.

Still, Drennan represents that the listing on the Hospital's bill for "anes 1 hr" is sufficient to create a fact question of whether the Hospital billed for anesthesia, thereby attempting to establish some evidence of the Hospital's control over Harman's work. But, when considered in toto, the statement clearly shows that the Hospital billed only for anesthesia supplies and facilities, not for the services provided by Harman.

Harman's and Kozar's affidavit testimony evinced that Harman was an independent contractor who, outside the parameters and control of the Hospital, determined the details, with Dr. Theo, of the method of providing anesthesia to Amy. Drennan offered no evidence to refute the testimony, and no evidence of respondeat superior regarding Harman was presented. *Id.*

Though much dispute was raised concerning which of the summary judgments presented in the record in favor of Dr. Barber is the true final judgment, Drennan presents no evidence of any contractual relationship between the Hospital and Dr. Barber to impute any negligence of Dr. Barber to the Hospital, or to contradict Kozar's affidavit testimony that Dr. Barber was an independent contractor. As a result, she presented no evidence of respondeat superior as to Dr. Barber, *id.,* and it is unnecessary that we determine which summary judgment is afforded validity. Tex.R.App.P. 90(a).

Likewise, Drennan presented no evidence of any employment relationship between Dipprey and the Hospital to refute the summary judgment evidence that Dipprey was the employee of Owen Health Care, Inc., rather than the Hospital, and that the Hospital did not control his work. There was no evidence of respondeat superior in connection with the Pharmacy. *Gladewater Municipal Hosp. v. Daniel,* 694 S.W.2d at 621.

Then, as a matter of law, the Hospital could not be liable for the acts or omissions alleged to be imputed to it on the basis of respondeat superior, because each of the alleged acts or omissions was that of an independent contractor. *Abalos v. Oil Development Co. of Texas,* 544 S.W.2d 627, 631 (Tex. 1976); *Jeffcoat v. Phillips,* 534 S.W.2d at 172. Resultantly, we need not reach any question of whether Harman was negligent in his administration of anesthesia. Tex.R.App.P. 90(a).

■ Drennan's allegations of imputed liability against the Hospital are also based upon a contention of ostensible agency. Drennan recognizes that ostensible agency, a form of estoppel, is comprised of three elements, and that, to escape summary judgment, she must have raised a fact issue concerning one of the following: (1) that she had a reasonable belief in Harman's, Dr. Theo's, Dr. Barber's, or the Pharmacy's authority; (2) her belief was generated by some holding out by act or neglect of the Hospital; or (3) she justifiably relied upon the representation of authority. *Nicholson v. Memorial Hosp. System,* 722 S.W.2d at 750.

■ Drennan made no offering of summary judgment proof of authority for Dr. Theo, Dr. Barber and the Pharmacy outside that outlined above in relation to respondeat superior. Having previously determined the evidence to be insufficient to vitiate the summary judgment on the theory of respondeat superior, we do not address the contention of ostensible agency in relation to doctors Theo and Barber, or the Pharmacy.

Drennan relies upon her affidavit, and that of her sister, Sandra Lytal, to create a fact issue of whether Harman was the ostensible agent of the Hospital. Lytal stated that

Ben Harman came in to the room while we were there. I remember that he stood at the foot of Amy's bed, introduced himself as Ben Harman and told us that he was going to be putting Amy to sleep and he asked if anyone had any questions. I do not recall that Amy or any family member asked any questions.... I had no idea that Highland Hospital was using CRNAs in the anesthesia department.... No one, including Ben Harman, told me or Amy or any member of the family, in my presence, that Ben Harman was a CRNA and not an M.D. anesthesiologist. It was my assumption that he was a physician. Had anyone told us that he was a CRNA before Amy's surgery, I would have told Sharon Drennan that she should not let a CRNA be involved in Amy's care and that she should request an M.D. anesthesiologist to provide the anesthesia care at all times.

Drennan did not remember Harman coming to Amy's room the morning of her surgery, but supposed that her sister was "probably correct in her statement that he did." She stated that, "If he did indeed come in to visit Amy's room the morning of surgery to indicate that he would be providing anesthesia to Amy, I would have assumed that he was a physician." She further stated that had she known the difference between a CRNA and a medical doctor, she would have requested a medical doctor provide the service, and that:

> The very fact that Highland Hospital allowed Ben Harman to provide a service to patients implied that he was in fact a physician or the equivalent of a physician in training and experience and I relied upon this in allowing Amy to have her surgery at Highland Hospital.

Obviously, the affidavit testimony was couched in phrases of assumptions, would-be assumptions, and "had I known." Such testimony amounts to no more than possibilities based upon mere speculation and conjecture; thus, it is insufficient to raise a fact issue. *Duff v. Yelin,* 751 S.W.2d 175, 176 (Tex.1988); *Lopez v. Central Plains Regional Hosp.,* 859 S.W.2d at 604. This obtains, because any stated reliance upon such conjecture is not evidence of reasonable reliance.

Drennan represents that her cause fits well within the doctrine of ostensible agency expressed in *Baptist Memorial Hosp. System v. Smith,* 822 S.W.2d at 70, 74–76, but we are not so persuaded. There, a jury found, after a conventional trial on the merits, that the physician was an ostensible agent of the hospital upon evidence that the hospital had contracted with a group of physicians to staff its emergency room, the physician rendering treatment was hired by the group of physicians, a patient entering the emergency room would ask for a doctor to render treatment, and the hospital billed the patient for services of the emergency room doctor. Those are not the circumstances in the present action.

Here, the situation is more compatible with the circumstances present in *Nicholson v. Memorial Hosp. System,* 722 S.W.2d at 750, where summary judgment was affirmed when plaintiff-appellant, under circumstances very similar to those in this action, failed to raise a fact issue on each element of ostensible agency. She did not produce any evidence to raise the fact issues that she believed an agency existed because of some representation by the Hospital, and that she justifiably relied upon such representation. Thus, the Hospital's evidence established as a matter of law there was no agency. *Accord Lopez v. Central Plains Regional Hosp.,* 859 S.W.2d at 605; *Jeffcoat v. Phillips,* 534 S.W.2d at 172–73.

Still, to raise a fact issue of the Hospital's negligence, Drennan offers the deposition testimony of Dr. Krantz. The doctor, a board certified anesthesiologist, expressed the opinion, represented to conform to the guidelines set out by the American Society of Anesthesiology, that in a hospital the size of Highland Hospital, "their by-laws allowing surgeons to be responsible for the administration of anesthesia is below the standard of care," and that "a surgeon is not qualified to manage anesthesia complications." He further opined that the negligence was a proximate cause of Amy's cardio-respiratory arrest.

Doctor Krantz, who practiced only in California, conceded that his opinion was a personal one and was not reflective of the prac-

tice in Texas. He also agreed that other people, such as anesthesiologists or groups that might represent CRNAs, may differ with his opinion.

▬▬▬ Granting the doctor's personal opinion of the Hospital's negligence, it must be measured by the legal principles that the first element of negligence is the existence of a legal duty, which is a question of law. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990). Generally, there is no duty to control the conduct of third persons, *id.*, and this principle is particularly applicable to the previously illustrated lack of the Hospital's right to control the conduct of the independent contractors responsible for Amy's injury. Even assaying the question of duty in consideration of interrelated factors, the most important of which is foreseeability, *id.*, there is nothing in this record showing that the Hospital could foresee harm would befall Amy by allowing her independent surgeon to be responsible for the administration of anesthesia. Thus, the trial court was justified in finding as a matter of law that Dr. Krantz's testimony did not raise an issue of fact of the Hospital's duty regarding the administration of anesthesia. *Mitchell v. Amarillo Hosp. Dist.*, 855 S.W.2d at 874.

▬▬ Drennan also contends for the Hospital's direct liability for the breach of a pleaded duty to use reasonable care in formulating and enforcing its policies and procedures by which its medical staff, pharmacy staff and nursing staff were governed. The focus of her argument, as we understand it, is that "[i]f Ben Harman was acting beyond the scope of his authority, then the Hospital is directly responsible." We discern from Drennan's presentation of her first sub-point, which is addressed later, that Drennan alleged Harman acted beyond the scope of his authority because he secured the Atracurium without a written prescription or standing order and, thereby, illegally practiced medicine without a license. It suffices, for the purpose of this contention, to state that Harman's services were engaged by Dr. Theo, who was authorized to delegate to Harman, by order, the act of administering or providing the anesthesia. Tex.Rev.Civ.Stat.Ann. art. 4495b, § 3.06(d) (Vernon Pamp.1995).

Drennan's second through sixth sub-points are overruled.

The gist of Drennan's seventh sub-point contention of a joint enterprise is the allegation that there was a financial benefit to all the original defendants, and such "could not be accomplished without some agreement for there to be 24-hour anesthesia coverage." The Hospital and the Pharmacy presented competent summary judgment evidence to negate the existence of a joint enterprise; thus, Drennan had the burden to come forth with evidence to raise a fact issue on the elements of a joint enterprise. *Gibbs v. General Motors Corp.*, 450 S.W.2d at 829.

▬▬ A joint enterprise consists of four elements: (1) a community of interest in the venture; (2) an agreement to share profits; (3) an agreement to share losses; and (4) a mutual right of control or management of the enterprise. *Ayco Development Corp. v. G.E.T. Service Co.*, 616 S.W.2d 184, 186 (Tex. 1981). The equal right of all the parties to direct and control the conduct of each other in obtaining the objectives of the enterprise may be expressed or implied. *Oates v. Yancy*, 426 S.W.2d 594, 599 (Tex.Civ.App.—Fort Worth 1968, writ ref'd n.r.e.).

▬▬ The uncontroverted summary judgment evidence was that the Hospital had no control over the methods of practice by, nor did it bill for the services of, Dr. Theo, Dr. Barber, Harman, or the Pharmacy. Further, Drennan presented no evidence of any agreement with respect to a joint enterprise. Having failed to proffer evidence of the elements of joint enterprise, Drennan did not raise a question of material fact. Her seventh sub-point is overruled.

By her eighth through tenth sub-points, Drennan contends she stated a viable cause of action against the Hospital and the Pharmacy under the DTPA. Her underlying complaint is against Harman's services in providing anesthesia to Amy. Stemming from this complaint are her allegations of imputed negligence, negligent supervision, and negligence per se.

▬▬▬ Drennan's appellate contention is that her allegations of violations of the DTPA

are not based upon negligence because they result from the failure of the Hospital and Pharmacy to inform her that Harman was a CRNA rather than a medical doctor.[4] However, a cause of action based upon a failure to inform a patient of risks associated with surgery is a negligence cause of action. *McKinley v. Stripling*, 763 S.W.2d 407, 409 (Tex. 1989).

The Medical Liability and Insurance Improvement Act of Texas, which governs the theory of recovery for the failure of a health care provider to disclose the risks or hazards involved in a surgical procedure that could have influenced a reasonable person in making a decision to give or withhold consent, *id.*, provides in pertinent part:

> (a) Notwithstanding any other law, no provision of Sections 17.41–17.63, Business & Commerce Code, shall apply to physicians or health care providers as defined in Section 1.03(3) of this Act, with respect to claims for damages for personal injury or death resulting, or alleged to have resulted, from negligence on the part of any physician or health care provider.
>
> (b) This section shall not apply to pharmacies.

Tex.Rev.Civ.Stat.Ann., art. 4590i, § 12.01 (Vernon Pamp.1995). A hospital is included within the definition of "Health care provider." *Id.* at § 1.03(3). It follows that Drennan's claim of the Hospital's violation of the DTPA is precluded. *Sorokolit v. Rhodes*, 889 S.W.2d 239, 242 (Tex.1994).

In making her allegations of violations of the DTPA against the Pharmacy, Drennan relies upon her affidavit testimony, and that of her sister, previously outlined. Because, she contends, Harman did not clarify his position, she assumed him to be a physician, and the Pharmacy did nothing to dissuade her assumption while providing drugs to Harman, the Pharmacy misrepresented Harman's qualifications and violated sections 17.46(b)(2), (3), (5), (7), (23) and 17.50(a)(1) of the DTPA.

It is not the function of a pharmacy to discuss with a patient the risks and benefits of surgery and the qualifications of the parties performing such; that duty lies with the physician. *Accord Ritter v. Delaney*, 790 S.W.2d 29, 31 (Tex.App.—San Antonio 1990, writ denied). The record is devoid of any offering of evidence that the Pharmacy nevertheless made, or attempted to make, or encouraged, any representation concerning Harman's qualifications, or that it was privy to Drennan's assumptions. Moreover, her assumptions were based upon conjecture, and are insufficient to raise a fact issue. *Duff v. Yelin*, 751 S.W.2d at 176; *Lopez v. Central Plains Regional Hosp.*, 859 S.W.2d at 604. Drennan's eighth through tenth subpoints are overruled.

By her first sub-point, Drennan contends the Pharmacy was negligent per se in delivering dangerous drugs to Harman without a written prescription or standing order from a licensed physician, and was negligent per se in aiding him. In making her contention, Drennan refers to provisions of The Texas Medical Practice Act;[5] rules and regulations promulgated to regulate the practice of nursing, pharmacies and pharmacists; and

---

**4.** Drennan alleged the Hospital and the Pharmacy were unconscionable in their actions, section 17.50(a)(1), and that they violated the following laundry list items:

> (2) causing confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services;
>
> (3) causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by another;
>
> (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has sponsorship, approval, status, affiliation or connection which he does not;

> (7) representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model when they are of another;
>
> (23) the failure to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

*See* Tex.Bus. & Comm.Code Ann. § 17.46(b)(2), (3), (5), (7), and (23) (Vernon 1987).

**5.** Tex.Rev.Civ.Stat.Ann. art. 4495b (Vernon Pamp.1995).

section 483.042 of the Texas Dangerous Drug Act.[6]

To support her contention of negligence per se, Drennan relies on the affidavit of pharmacist Petry, who interpreted selected Texas Pharmacy Rules to express an opinion of the standard of care for running a pharmacy. Under that standard of care, so Petry opined, Dippery was required to ascertain whether or not Harman was a "person licensed or registered to prescribe, distribute, administer or dispense a prescription drug or device in the course of professional practice in this state." His further opinion was that the licensing and rules for CRNAs does not qualify a CRNA to choose drugs or drug dosages for patients, and that the Medical Practices Act does not allow a physician to delegate the total choice of drugs and drug dosage to a non-physician, except under limited conditions. He concluded with the opinion that a pharmacist breaches the standard of care in allowing any non-physician to remove drugs from floor stock for administration to a patient, unless a physician or hospital has approved specific drugs and drug dosages through standing medical orders for the patient, and was authorized to administer the drugs after they were chosen.

■ However, the construction of the pharmacy rules involves questions of law for the court, not questions of fact for a pharmacist. *Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex.1989). Consequently, we will apply the applicable law to the summary judgment evidence.

The summary judgment evidence established that the Pharmacy utilized the "floor stock" method of distribution. Distribution methods are regulated by the Texas Administrative Code, and facilities using the floor stock method of pharmaceutical distribution are required to abide by the following pertinent regulations:

(A) Prescription drugs and devices may be removed from the pharmacy only in the original manufacturer's container or prepackaged container.

(B) Only a designated licensed nurse or practitioner may remove such drugs and devices.

(C) A record shall be made at the time of withdrawal by the authorized person removing the drug or device; . . .

(D) A pharmacist shall verify the withdrawal after a reasonable interval, but in no event may such interval exceed seven days.

22 Tex.Admin.Code § 291.74(e)(2) (West 1995) (Texas State Board of Pharmacy).

It was further established that the Pharmacy was not open to the public, but merely supplied the floor stock with pharmaceutical supplies; in other words, it did not sell drugs, it sold the service of supplying drugs to the Hospital through the floor stock. Qualified practitioners or their authorized agents, including nurses, removed the drugs and recorded their name and the removal date. On the occasion in question, the pharmacist ascertained within 72 hours of the removal who removed the drug from the floor stock, who ordered the drug removed, the name of the drug, or to whom the drug was administered. Dipprey did not directly dispense the Atracurium to Harman, but ascertained on 21 March 1990, the day after Amy's surgery, that Harman, upon Dr. Theo's order for general anesthesia, removed the Atracurium and Sodium Pentothal.

The summary judgment evidence was clear and uncontroverted that the prescribed procedures were followed by the Pharmacy in providing, and Harman in removing, the drugs. Thus, neither the Pharmacy nor Harman violated the Administrative Code provisions governing floor stock distribution of drugs. *Id.*

■ Drennan further contends that Harman and the Pharmacy were negligent per se in violating article 483.042 of the Dangerous Drug Act by delivering the Atracurium to Harman without a written prescription or standing order. The Pharmacy responded

---

**6.** References herein to the "Dangerous Drug Act," as identified by Drennan, are to Texas Health and Safety Code Annotated, sections 483.001 *et seq.* (Vernon 1992 & Supp.1995).

that the order for "general anesthesia" was sufficient to allow Harman to remove the necessary drugs from the floor stock and administer the anesthesia, and supported the proposition with a letter from the Texas State Board of Pharmacy stating that such was the customary practice in this state. Further, the Pharmacy contended the provisions for a written or standing order did not apply to it.

Negligence per se is a tort concept whereby the civil courts adopt a legislatively imposed standard of conduct as defining the conduct of a reasonably prudent person. The unexcused violation of a statute constitutes negligence as a matter of law if the statute was designed to prevent injury to the class of persons to which the injured party belongs. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 312 (Tex.1987); *Missouri Pac. R. Co. v. American Statesman*, 552 S.W.2d 99, 102–03 (Tex.1977).

The purpose behind the statutes governing the distribution of dangerous drugs is to protect the public from abuses in the sale of prescription drugs to users, not to control the administration of drugs by those qualified to prescribe and administer them as medically indicated. Section 483.042, *supra*, is not applicable to pharmacies, as it provides:

> Subsection (a) does not apply to the delivery or offer for delivery of a dangerous drug to a person listed in 483.041(c) for use in the usual course of business or practice or in the performance of official duties by the person.

Tex.Health & Safety Code Ann. § 483.042(b) (Vernon Supp.1995). Section 483.041(c) includes both hospitals and pharmacies. *Id.* at § 483.041(c)(1) & (4).

The statute was not designed to prevent the injury of which Drennan complains. Consequently, there is no showing of the Pharmacy's per se violation of the Dangerous Drug Act.

Section 3.06(d)(3) of the Medical Practice Act, which Drennan contends was per se violated, provides:

> (3) a person licensed to practice medicine shall be authorized and shall have the authority to delegate to any qualified and properly trained person or persons, acting under the physician's supervision, the act or acts of administering or providing dangerous drugs, if the provision is provided through a facility licensed by the State Board of Pharmacy pursuant to applicable law, as ordered by the physician, which are used or required to meet the immediate needs of the physician's patients. The administration or provision, as ordered by a physician, may be delegated through physician's orders, standing medical orders, standing delegation orders, or other orders, where applicable, as the orders are defined by the board. . . .

Tex.Rev.Civ.Stat.Ann., art. 4495b, § 3.06(d)(3) (Vernon Pamp.1995).

There was uncontroverted evidence that Dr. Theo directed Harman to provide general anesthesia. There was ample evidence that it was the customary practice that when a surgeon directed general anesthesia, the CRNA provided the related services, including removal of the necessary drugs from floor stock, and the subsequent administration of the drugs.

Drennan further contends that because Dr. Theo did not issue a written prescription for the Atracurium, Harman, without supervision, chose the drug and, as a result, illegally practiced medicine without a license. By attacking Harman's authority to act as he did, Drennan brings to question the propriety of the Hospital's pharmaceutical supply system of allowing nurses to remove drugs from the floor stock.

The competent summary judgment evidence provided that the use of nurse anesthetists is a widespread and commonly accepted method of providing anesthesia throughout the State of Texas. The letter from the State Board of Pharmacy established that the independent practice of a CRNA is sanctioned in Texas and throughout the United States, that physicians may rely on a CRNA to make appropriate drug choices without prior approval, and that an order need not be drug specific. Rather, an order for "general anesthesia" is sufficient.

Moreover, in determining allegations of violations of statutes similar to those at issue

in the present matter, several of our sister states have found it a customary practice to rely upon a CRNA to execute treatment prescribed by a licensed physician, *Gore v. United States,* 229 F.Supp. 547, 549 (E.D.Mich.1964), to decide which drugs are best suited for the particular situation, *Brown v. Allen Sanitarium, Inc.,* 364 So.2d 661, 664 (La.App.1978, writ denied), and perform the duties as directed by the physician-surgeon. *Chalmers–Francis v. Nelson,* 6 Cal.2d 402, 57 P.2d 1312, 1313 (1936). We are in harmony with our sister states.

The Pharmacy presented competent summary judgment evidence that it, and Harman, followed the statutory guidelines governing floor stock distribution, and that Harman was acting within the bounds of the statutory provisions for the guidance of a CRNA. Thus, Drennan, by her response and the use of Petry's interpretation of the pharmacy rules, failed to refute the evidence supporting the Pharmacy's motion for summary judgment. We, therefore, overrule Drennan's first sub-point.

Accordingly, Drennan's motion for rehearing is overruled, and the summary judgment rendered by the trial court is affirmed.