

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00055-CV

_____

TEXAS HEALTH HARRIS METHODIST HOSPITAL SOUTHWEST FORT WORTH, Appellant and Appellee

V.

JOHN DAVIS, INDIVIDUALLY AND AS GUARDIAN OF THE PERSON AND ESTATE OF ANGELA DAVIS, AN INCAPACITATED PERSON, Appellee and Appellant

On Appeal from Probate Court No. 2
Tarrant County, Texas
Trial Court No. 2014-GD00516-2-A

Before Kerr, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Bassel
Concurring and Dissenting Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

## I. INTRODUCTION

Raising four issues, Texas Health Harris Methodist Southwest Fort Worth (Harris) appeals from a judgment in a medical-malpractice action rendered in favor of John Davis, individually and as guardian of his wife Angela Davis's estate,[1] following a jury trial. Davis filed his own notice of appeal raising two issues. Based on our disposition of Harris's first two issues, we reverse the trial court's judgment and remand this case to the trial court for a new trial.[2]

The question raised by Harris's first issue is the primary one that we must answer: whether the trial court abused its discretion by allowing Davis to introduce into evidence the CMS[3] Conditions of Participation—federal regulatory standards that govern whether a health care provider is eligible to accept Medicare or Medicaid—as proof of the applicable "standard of care." Because the CMS Conditions do not impose a state common-law tort duty on hospitals and because their probative value, if any, was substantially outweighed by the danger of unfair prejudice, confusing the

---

[1]Because Angela was incapacitated by the injuries giving rise to this lawsuit, Davis was appointed as Angela's legal guardian. This lawsuit was tried in the probate court as a proceeding ancillary to the guardianship case. *See Estate of Stavron*, No. 02-20-00404-CV, 2021 WL 5227081, at *3 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.) (discussing probate court's pendent and ancillary jurisdiction).

[2]Because Harris's first two issues are dispositive, we will not address the parties' remaining issues. *See* Tex. R. App. P. 47.1.

[3]CMS stands for Centers for Medicare and Medicaid Services. *See Christus Health Gulf Coast v. Aetna, Inc.*, 237 S.W.3d 338, 339 & n.1 (Tex. 2007).

issues, or misleading the jury, we conclude that the trial court abused its discretion by admitting them. Further, because the CMS Conditions gave the jury the false impression that Davis's vicarious-liability theory—though invalid under Texas law—had the imprimatur of the federal government, the admission of these regulations likely caused the rendition of an improper judgment. Accordingly, we sustain Harris's first issue.

But we overrule Harris's second issue—which, because it seeks a rendition of judgment, we address first below—challenging the legal sufficiency of the evidence to support the jury's negligence finding. In essence, Harris contends that because the medication error at the heart of this case was committed by an independent contractor, not a hospital employee, and because (1) Harris had no common-law duty to promulgate or enforce policies regarding independent contractors' clinical activities and (2) Davis's proposed medication-handling policy would not have prevented the error that caused Angela's injuries, the evidence is legally insufficient to support the jury's negligence finding against Harris. However, as we will detail below, Harris owed Angela a direct duty to use reasonable care in formulating the policies and procedures that govern its medical staff and nonphysician personnel, and the record contains ample evidence to support a finding that Harris's breach of this duty proximately caused Angela's injuries. Thus, remand—not rendition—is the appropriate remedy.

## II. BACKGROUND

In May 2014, Angela underwent anesthesia for elective hip surgery at Harris. After receiving a spinal injection, Angela exhibited seizure-like activity, and it was ultimately determined that she had sustained very significant brain damage. Angela's brain injury was likely caused by a substitution error whereby the blood-clotting medication tranexamic acid was accidentally injected into her spine instead of the anesthetic agent bupivacaine.

At the time of Angela's injury, Sundance Anesthesia, P.A. had an exclusive contract with Harris to serve as the hospital's anesthesia provider. Thus, all of the medical professionals responsible for Angela's anesthetic care—certified registered nurse anesthetists (CRNAs) Vicki Tucker and Heather Goforth and attending anesthesiologist Dr. Bruce Leitch[4]—were employed by Sundance, not by Harris.

Although Goforth was Angela's assigned CRNA, Goforth and Tucker worked together to set up the operating room, each performing different tasks. While Goforth focused on setting up the anesthesia machine with the equipment that she would need during the procedure, Tucker drew up the medications. As part of this process, Tucker removed the anesthesia-related medications from the drawer of the

---

[4]Under the terms of the contract between Harris and Sundance, Dr. Leitch was designated as the Medical Director of Harris's anesthesia department, which is an unofficial department within Harris's department of surgery.

4

Pyxis machine,[5] affixed preprinted labels to the syringes identifying the medications to be drawn, and then proceeded to fill the syringes with the necessary medications. Although Goforth was in the operating room at the time, neither she nor any other person watched Tucker to verify that she had properly labeled the medications when placing them into the syringes. After Goforth, as the provider of record, initialed and dated the medication labels, the syringes were placed into safe storage in the Pyxis machine.

After the operating room was prepared, Goforth went to meet Angela in the pre-op area. Once Angela was taken to the operating room, Goforth took the syringe that she believed contained bupivacaine, injected the contents into a sterile well, drew the fluid with a sterile syringe, and injected it into Angela's spine.

Following the spinal injection, Angela began kicking her legs and displaying other seizure-like activity. Accordingly, Dr. Leitch decided to switch to general anesthesia, and the surgery proceeded. But after the surgery, Angela did not wake up as expected. It was later determined that tranexamic acid had been inadvertently injected into Angela's spine instead of bupivacaine and that she had suffered severe brain damage as a result. However, it is uncertain whether the substitution error was

---

[5]Goforth likened the Pyxis machine to a vending machine. She explained that when she input the patient's name and selected the list of medications that she wanted, the Pyxis machine's drawers would open up to dispense the medications. The machine requires service providers to log in and keeps a permanent electronic record of the medications it dispenses.

caused by Tucker's mislabeling of the syringes or by Goforth's administration of the wrong, but correctly labeled, medication.

In May 2016, Davis, acting both in his individual capacity and as guardian of Angela's estate, filed suit against Harris, Sundance, Dr. Leitch, Goforth, and Tucker.[6] Davis subsequently settled the claims asserted against Sundance, Dr. Leitch, Goforth, and Tucker; thus, Harris was the only defendant at trial.

In his fourth amended petition,[7] Davis alleged that Harris's negligence—both direct and vicarious—had caused Angela's injuries. According to Davis, Harris had directly violated the standard of care by failing to formulate, communicate, and enforce policies and procedures applicable to its medical staff and nonphysician personnel that were designed to minimize or prevent medication errors during the administration of anesthesia. Davis also alleged that Harris was vicariously liable for Dr. Leitch's and Sundance's failure to formulate and enforce policies designed to minimize or prevent medication errors in the anesthesia department because Dr. Leitch and Sundance were Harris's nonemployee agents.

---

[6]Davis's original petition also named several other physicians as defendants, but he nonsuited all claims against them.

[7]Davis filed a fifth amended petition on the eve of trial, but after Harris objected that it was untimely under the scheduling order and the procedural rules, the trial court signed an order striking it from the record. Thus, Davis's fourth amended petition appears to be his "live" pleading.

Specifically, Davis asserted that Goforth and Tucker had failed to follow a two-step medication verification process set forth in the Joint Commission's[8] National Patient Safety Goal (NPSG) 03.04.01 and that their failure to follow that process resulted in the mislabeling error that caused Angela's injuries. Although Harris did not have a policy conforming to NPSG 03.04.01 that applied to the anesthesia department (which was entirely composed of independent contractors), it did have a somewhat similar dual-verification policy that applied specifically to its employees (in particular, scrub and circulator nurses) in the operating suite. Under Davis's legal theories, Harris was liable—either directly or vicariously—because the absence of a dual-verification policy applicable to the anesthesia department had caused Angela's injuries.

At trial, Davis offered certain Joint Commission standards for hospital accreditation; a guideline promulgated by the American Association of Anesthesiologists (ASA); and the CMS Conditions—which, as noted above, are federal regulatory standards that govern whether a health care provider is eligible to accept Medicare or Medicaid—as evidence of the applicable standard of care and to show that Harris had a duty to exercise control over its independent contractors. The CMS Conditions in particular were offered to show that Harris and its governing

---

[8]The Joint Commission is the current name of the former Joint Commission on Accreditation of Healthcare Organizations, commonly referred to as the JCAHO. 1 Health L. Prac. Guide § 10:25 (2024). The Joint Commission accredits and certifies more than 21,000 health care organizations and programs nationwide. *Id.*

board were responsible for all care provided within the hospital regardless of whether it was furnished by hospital employees or independent contractors. Harris objected to the admission of these documents and moved to strike and exclude witness testimony concerning them on both relevance and Rule 403 grounds, but the trial court overruled Harris's objections.

Ultimately, the jury found that Goforth, Tucker, and Dr. Leitch were either not negligent or not a proximate cause of Angela's injuries by answering "No" to the following question: "Did the negligence, if any, of those named below proximately cause the occurrence in question?" The jury found that Harris's and Sundance's negligence had proximately caused Angela's injuries and apportioned 35 percent of the responsibility to Sundance and the remaining 65 percent to Harris. The jury awarded Angela's estate a total of $7,709,305 in damages and awarded Davis individually $661,000 in damages.

Following extensive briefing by the parties on the topics of settlement credits, interest, and Harris's request that the award of future medical expenses be paid periodically in the future, the trial court signed a final judgment awarding Angela's estate a total of $1,768,529.27 for past and future noneconomic damages, past and future economic damages, and prejudgment interest after "applying the statutory damage caps pursuant to Chapter 74 of the Texas Civil Practice & Remedies Code." In addition, the trial court—granting Harris's motion for the periodic payment of future medical expenses and reducing the jury's award by 35 percent based on Harris's

election of a percentage settlement credit—ordered Harris to pay Angela's estate a total of $3,781,653.20 for future medical expenses in installments over nine years (with an allowance for attorney's fees).[9] The trial court also awarded Davis individually a total of $490,778.74 in past and future noneconomic damages, past and future economic damages, and prejudgment interest.

Harris timely appealed, and Davis filed a separate notice of appeal.

### III. DISCUSSION

On appeal, Harris raises four issues. First, it contends that the trial court abused its discretion by admitting the CMS Conditions and testimony concerning these regulations because this evidence was irrelevant and because its probative value, if any, was substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury. *See* Tex. R. Evid. 402, 403. Second, Harris argues that the evidence is insufficient to support the jury's finding that Harris's negligence proximately caused Angela's injuries. Third, Harris asserts that the trial court abused its discretion by admitting evidence referencing the Joint Commission standards and the ASA guideline because these documents are irrelevant to the standard of care and unfairly prejudicial under Rule 403. *See* Tex. R. Evid. 403. Finally, Harris argues that the admission of the CMS Conditions, the Joint Commission standards, and the ASA guideline constituted cumulative error that led to the rendition of an improper verdict.

---

[9]The judgment provided that in the event of Angela's death, Harris's future-medical-expense payments were to cease immediately. Angela passed away on June 10, 2023.

9

In his notice of appeal, Davis raises two issues. First, he asserts that the trial court committed charge error by submitting Sundance's negligence and proportionate liability to the jury because these issues were not raised by Harris's pleadings and were not tried by consent. Second, Davis contends that the trial court erred by requiring the jury's present-value award for future medical expenses to be paid in periodic installments.

Because it provides necessary context for our evaluation of Harris's first issue and because it would result in a rendition of judgment,[10] we begin our analysis with Harris's second issue.[11]  *See Nat. Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 201 (Tex. 2003) (op. on reh'g); *see also* Tex. R. App. P. 43.3.

## A. The Evidence is Sufficient to Support the Jury's Negligence Finding

In its second issue, Harris asserts that the evidence is legally insufficient[12] to support the jury's negligence finding against Harris. Specifically, Harris contends that

---

[10]Generally, if we reverse a trial court's judgment on legal-insufficiency grounds, rendition is the appropriate remedy. *Vista Chevrolet, Inc. v. Lewis*, 709 S.W.2d 176, 176 (Tex. 1986); *see Sw. Key Program, Inc. v. Gil-Perez*, 81 S.W.3d 269, 270 (Tex. 2002) (rendering judgment against the plaintiff in a negligence case when there was legally insufficient evidence of proximate cause).

[11]As noted above, because our disposition of Harris's first two issues dictates that we reverse the trial court's judgment and remand this cause for further proceedings, we will not address the parties' remaining issues. *See* Tex. R. App. P. 47.1.

[12]In its briefing supporting its second issue, Harris contends that "there was no evidence or insufficient evidence" to support the jury's negligence finding against Harris. This phrasing makes it unclear whether Harris's sufficiency challenge is

10

there is legally insufficient evidence (1) to impute Sundance's or Dr. Leitch's negligence to Harris, (2) to impose a common-law duty on Harris to draft and enforce policies applicable to its contracted anesthesia service providers' practice of medicine, or (3) to establish a causal relationship between Harris's alleged negligence and Angela's injuries. For the reasons set forth below, we agree with the first of these contentions, but we reject the others.[13]

### 1. Standard of Review

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of

---

strictly based on legal insufficiency or based on both legal and factual insufficiency. Because Harris raises arguments relating only to legal insufficiency and requests only that we reverse and render judgment in its favor if we sustain its second issue, we construe its second issue as strictly raising a legal-sufficiency challenge. *See Dunn v. Mengtai Petroleum Mach. Co., Ltd.*, No. 02-17-00425-CV, 2019 WL 3024479, at *1 n.1 (Tex. App.—Fort Worth July 11, 2019, no pet.) (mem. op.). Further, given our disposition of Harris's first issue, *see infra* Section III.B., a factual-sufficiency analysis would be a purely academic exercise.

[13]Davis claims that Harris failed to preserve its evidentiary-sufficiency complaint. *See Steves Sash & Door Co. v. Ceco Corp.*, 751 S.W.2d 473, 477 (Tex. 1988) (instructing that there are "five ways to preserve a 'no evidence' point of error: (1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the issue to the jury; (4) a motion to disregard the jury's answer to a vital fact issue; or, (5) a motion for new trial"). But because we conclude that there is legally sufficient evidence to support Davis's direct-negligence claim and thus overrule Harris's second issue on the merits, we need not address this preservation question. *See In re A.A.*, 670 S.W.3d 520, 525 n.13 (Tex. 2023) ("Because we reject [appellant's] complaint on its merits, we need not decide if it is really a procedural one that she was required to preserve."); *cf. Goodyear Tire & Rubber Co. v. Rogers*, 538 S.W.3d 637, 644–45 (Tex. App.—Dallas 2017, pet. denied) (overruling appellant's legal-insufficiency argument on the merits even though it appeared that appellant had failed to preserve the issue).

law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining whether legally sufficient evidence supports the challenged finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

### 2. Applicable Law Regarding Davis's Liability Theories

In the present case, Davis asserted both direct- and vicarious-liability theories against Harris. Davis alleged that Harris had breached its direct duty to use reasonable care (1) in formulating the policies and procedures that govern its medical staff and nonphysician personnel and (2) in exercising control over its anesthesia department, which was composed entirely of independent contractors.[14] *See Denton*

---

[14]This second purported direct-liability theory is a negligent-control claim, commonly referred to as a "*Redinger* claim," whereby an employer may be held liable for the negligence of an independent contractor if the employer retained control over the contractor's work and failed to exercise reasonable care in exerting this control. *See Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985) (holding general contractor liable for negligence in supervising subcontractor's employee where general contractor

*Reg'l Med. Ctr. v. LaCroix*, 947 S.W.2d 941, 950 (Tex. App.—Fort Worth 1997, pet.

denied) (recognizing that a hospital owes a patient a direct duty "to use reasonable

care in formulating the policies and procedures that govern its medical staff and

nonphysician personnel" (citing *Air Shields, Inc. v. Spears*, 590 S.W.2d 574, 576–81

(Tex. App.—Waco 1979, writ ref'd n.r.e.))); *see also Owens v. Litton*, 822 S.W.2d 794,

796–97 (Tex. App.—Houston [14th Dist.] 1992, writ denied) (op. on reh'g)

---

retained right to direct order in which work was done and to forbid the work from being done in a dangerous manner, adopting Restatement (Second) of Torts § 414 (1965)); *see also* O'Connor's Texas Causes of Action ch. 38-C, § 4.1(2) (2022). Davis classified his *Redinger* claim as a direct-liability theory, but as we have previously recognized, it is unclear whether such claims are direct-liability or vicarious-liability claims under Texas law. *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 719 (Tex. App.—Fort Worth 2006, no pet.). Although the Restatement treats negligent-control liability as direct negligence, the Texas Supreme Court has characterized an employer's liability for a *Redinger* claim as vicarious. *Id.*; *see Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 791 (Tex. 2006) (discussing *Redinger* and explaining that "an employer can be held *vicariously* liable for the actions of an independent contractor if the employer retains some control over the manner in which the contractor performs the work that causes the damage" (emphasis added)); *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 528 (Tex. 1997) (characterizing *Redinger* as holding general contractor liable for independent contractor's negligence). Following the supreme court's lead, many of our sister courts have also described an employer's liability for a *Redinger* claim as vicarious. *See, e.g.*, *Martinez v. Boone*, 624 S.W.3d 241, 249–50, 253–54 (Tex. App.—El Paso 2021), *rev'd on other grounds sub nom. Cameron Int'l Airport v. Martinez*, 662 S.W.3d 373 (Tex. 2022); *Bustamante v. Gonzalez*, No. 04-09-00481-CV, 2010 WL 2298841, at *2 (Tex. App.—San Antonio June 9, 2010, pets. denied) (mem. op.); *Weiss v. Tucker*, Nos. 03-08-00088-CV, 03-08-00089-CV, 2009 WL 790310, at *3 (Tex. App.—Austin Mar. 27, 2009, pet. denied) (mem. op.); *Malone v. Ellis Timber, Inc.*, 990 S.W.2d 933, 935–36 (Tex. App.—Beaumont 1999, no pet.). Because Davis characterized his *Redinger* claim as a direct-liability theory and because the parties did not raise or brief this issue, we will assume, without deciding, that Davis's *Redinger* claim is a direct-negligence claim. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex. 2017) (assuming, without deciding, that Texas recognizes a cause of action for aiding and abetting because the parties had not raised or briefed the question).

(discussing negligent-control (i.e., *Redinger*) claim in the medical-malpractice context). Davis also alleged that Harris was vicariously liable under a nonemployee-agency theory for Dr. Leitch's and Sundance's failure to formulate and enforce policies designed to minimize medication errors in the anesthesia department. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 537 (Tex. 2002) (discussing nonemployee-agency claim in medical-malpractice case).

### a. Direct Liability

"Under Texas law, a hospital may be liable independently of the negligence of its physicians or employees." *LaCroix*, 947 S.W.2d at 950. Such direct liability arises from a hospital's "negligent performance of a duty owed directly to the patient." *Id.*; *see also Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 949 (Tex. 1998) (recognizing that an injured patient "may retain a direct cause of action against [a] hospital if the hospital was negligent in the performance of a duty owed directly to the patient"). As one of our sister courts has explained,

> [a] hospital is not a mere hoste[l]ry providing room and board and a place for physicians to practice their craft, but owes independent duties of care to its patients. A hospital owes duties directly to its patients to provide appropriate and usable medical equipment, to keep its premises in a reasonably safe condition, to not negligently allow termination of medical care, to use reasonable care in formulating the policies and procedures that govern its medical staff and nonphysician personnel, to exercise reasonable care in the selection of its medical staff, and to periodically monitor and review the medical staff's competence.

*Tenet Health Ltd. v. Zamora*, 13 S.W.3d 464, 471 (Tex. App.—Corpus Christi–Edinburg 2000, pet. dism'd w.o.j.) (citations omitted).

To prevail on a direct medical negligence cause of action against a hospital, a plaintiff must prove four elements: (1) the hospital's duty to act according to an applicable standard of care; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury. *LaCroix*, 947 S.W.2d at 950. But before a factfinder can consider whether a hospital's deviation from the standard of care is negligent, the plaintiff must first establish what the standard of care is. *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 409 (Tex. App.—Fort Worth 2003, no pet.).

The test used to determine a hospital's standard of care is what a hospital of ordinary prudence would have done under the same or similar circumstances. *Id.* (citing *LaCroix*, 947 S.W.2d at 950). The relevant circumstances include, but are not limited to, the expertise of and means available to the hospital and the state of medical knowledge. *Id.* (citing *Hood v. Phillips*, 554 S.W.2d 160, 165 (Tex. 1977)). Expert testimony is generally required to establish the governing standard of care and to determine whether the standard has been breached. *Id.* (first citing *Hood*, 554 S.W.2d at 165–66; and then citing *LaCroix*, 947 S.W.2d at 950).

### b. Vicarious Liability

In addition to being directly responsible for its own negligence, a hospital may, under certain circumstances, be vicariously liable for the negligence of its agents or employees. *See Sparger v. Worley Hosp., Inc.*, 547 S.W.2d 582, 585 (Tex. 1977) ("[H]ospitals are subject to the principles of agency law which apply to others.").

Under the theory of respondeat superior, an employer—including a hospital—may be vicariously liable for the negligence of its agent or employee even though the employer itself was not negligent. *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 910 (Tex. App.—Fort Worth 2009, pet. denied) (first citing *Wolff*, 94 S.W.3d at 541–42; then citing *Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 947; and then citing *Bell*, 205 S.W.3d at 713). To establish liability based on respondeat superior, a plaintiff must prove that: (1) an agency relationship (e.g., an employer–employee relationship) existed between the alleged tortfeasor and the employer; (2) the alleged tortfeasor committed a tort; and (3) the tort was committed in the course and scope of the tortfeasor's (i.e., the employee's) authority. *Knight v. City Streets, L.L.C.*, 167 S.W.3d 580, 582–83 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citing *Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 947).

But a person or entity that hires an independent contractor is generally not vicariously liable for the contractor's torts or negligence. *Farlow*, 284 S.W.3d at 910 (first citing *Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 947; then citing *Enserch Corp. v. Parker*, 794 S.W.2d 2, 6 (Tex. 1990); and then citing *Redinger*, 689 S.W.2d at 418). "For example, a hospital is ordinarily not liable for the negligence of a physician who is an independent contractor." *Id.* (first citing *Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 948; and then citing *Espalin v. Children's Med. Ctr. of Dall.*, 27 S.W.3d 675, 684 (Tex. App.—Dallas 2000, no pet.)).

16

To determine whether a principal–agent relationship giving rise to a respondeat superior claim exists, courts consider "the agreement between the parties, their words, and their conduct." *Royal Mortg. Corp. v. Montague*, 41 S.W.3d 721, 733 (Tex. App.— Fort Worth 2001, no pet.). A contract expressly providing that a person is an independent contractor "is determinative of the relationship absent evidence that the contract is a mere sham or subterfuge" designed to conceal the parties' true legal status. *Farlow*, 284 S.W.3d at 911 (first citing *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 588–90, 592 (Tex. 1964); then citing *Bell*, 205 S.W.3d at 713–14; and then citing *Weidner v. Sanchez*, 14 S.W.3d 353, 373 (Tex. App.—Houston [14th Dist.] 2000, no pet.)).

The right of control is the "supreme test" for determining whether a principal– agent relationship exists. *Id.* (first citing *Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 290 (Tex. 1996); and then citing *Omega Contracting, Inc. v. Torres*, 191 S.W.3d 828, 847 (Tex. App.—Fort Worth 2006, no pet.) (op. on reh'g)); *see Wolff*, 94 S.W.3d at 537 (noting that the key elements of a nonemployee-agency claim are "(1) benefit to the [principal] and (2) right of control"). Thus, even though the parties' agreement purports to create an independent-contractor relationship, the relationship may nevertheless give rise to a respondeat superior claim if other contract language or extrinsic evidence shows such a right of control that the relationship is actually that of employer–employee. *Farlow*, 284 S.W.3d at 911. However, for a right of control to be proven by extrinsic evidence, it "must be so

17

persistent and the acquiescence therein so pronounced as to raise an inference that at the time of the act or omission giving rise to liability, the parties by implied consent and acquiescence had agreed that the principal might have the right to control the details of the work." *Id.* (quoting *Newspapers, Inc.*, 380 S.W.2d at 592).

In determining whether a party's right of control is sufficient to trigger vicarious liability, courts consider a number of factors, including: (1) the independent nature of the person's business; (2) the person's obligation to furnish necessary tools, supplies, and material to perform the job; (3) the right to control progress of the work, except as to final results; (4) the time for which the person is employed; and (5) the method of payment, whether by time or by the job. *Id.* (first citing *Tex. A&M Univ. v. Bishop*, 156 S.W.3d 580, 584–85 (Tex. 2005); and then citing *Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002)). "To trigger vicarious liability, the right to control must extend to the specific activity from which the injury arose." *Id.* at 911–12 (first citing *Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 736 (Tex. 1998); then citing *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex. 1993); and then citing *Omega Contracting*, 191 S.W.3d at 847).

Although the right to control is ordinarily a question of fact, the determination as to whether a contract gives a right to control is generally a question of law. *Id.* at 912 (first citing *Omega Contracting*, 191 S.W.3d at 847; and then citing *EPGT Tex. Pipeline, L.P. v. Harris Cnty. Flood Control Dist.*, 176 S.W.3d 330, 336 (Tex. App.— Houston [1st Dist.] 2004, pet. dism'd)). Further, "if the controlling facts are

undisputed, whether the relationship that exists is that of an employee or of an independent contractor is a question of law." *Id.* (first citing *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002); and then citing *EPGT Tex. Pipeline*, 176 S.W.3d at 336).

### 3. The Evidence Supporting Davis's Vicarious-Liability Theory is Legally Insufficient

As noted above, Davis asserted both direct- and vicarious-liability claims against Harris. In support of his vicarious-liability (or respondeat superior) claim, Davis alleged that Dr. Leitch and Sundance were Harris's nonemployee agents and that Harris was therefore vicariously liable for their failure to formulate and enforce policies designed to minimize medication errors in the anesthesia department. However, we agree with Harris that there is legally insufficient evidence to support the existence of a principal–agent relationship.

The Medical Director and Coverage Services Agreement between Harris and Sundance clearly states that Sundance and its CRNAs and anesthesiologists— including Dr. Leitch—are independent contractors:

> In the performance of the professional medical services and responsibilities assumed by [Sundance] under this Agreement, with regard to [Harris], *it is mutually understood and agreed that* [*Sundance*] *and all* [*anesthesiologists and CRNAs*] *made available by* [*Sundance*] *are, and at all times are, independent practitioners.* [Sundance] and [its anesthesiologists and CRNAs] shall perform Coverage Services *free of any direction or control by* [*Harris*], but in a manner consistent with currently approved methods and practices in the medical profession and in compliance with the standards of the Medical Staff and/or as otherwise provided in this Agreement. *Nothing in this Agreement shall be construed as giving* [*Harris*] *the*

19

*degree of control necessary to create an employer–employee relationship between* [*Harris*] *and* [*Sundance*]*, and neither* [*Sundance*] *nor any* [*anesthesiologist or CRNA employed by Sundance*] *is a partner or agent of* [*Harris*]. [Emphases added.]

Further, Sundance and Harris expressly acknowledged in the agreement that

[Sundance] and Anesthesiologists *shall remain entirely independent of* [*Harris*] as to the diagnosis and treatment of patients and with regard to all other medical, professional[,] and ethical affairs of [Sundance] and Anesthesiologists. Each [anesthesiologist and CRNA] accepts full responsibility for the professional services he/she renders to patients. [Emphasis added.]

Because the agreement explicitly characterized Sundance and Dr. Leitch as independent contractors, it was incumbent on Davis to present evidence—either intrinsic (i.e., other contract language) or extrinsic—showing that Harris nevertheless had a right of control extensive enough to create a principal–agent relationship between the parties. *Id.* at 911. But Davis presented no such evidence.

Indeed, by explicitly alleging in his petition that Harris had failed to exercise control over Sundance and Dr. Leitch, Davis, in essence, conceded that there was no extrinsic evidence showing that Harris had actually controlled Sundance's or Dr. Leitch's work, much less that it had done so persistently enough to raise an inference that Sundance and Dr. Leitch had impliedly consented to allow Harris to control the details of their work. *See id.*; *cf. TX Far W., Ltd. v. Tex. Invs. Mgmt., Inc.*, 127 S.W.3d 295, 307 (Tex. App.—Austin 2004, no pet.) ("It is well established that 'assertions of fact . . . in the live pleadings of a party are regarded as formal judicial admissions.'" (quoting *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568

20

(Tex. 2001))). Thus, any evidence of control would have had to come from the contract itself.

But the parties' agreement contains no language showing that Harris had retained a right of control extensive enough to give rise to a respondeat superior claim. *Farlow*, 284 S.W.3d at 911. The language that comes the closest is that requiring Sundance and each anesthesiologist and CRNA providing coverage services to "comply with [Harris's] policies and procedures in all material respects" and to "perform Coverage Services in accordance with [applicable] ethical and professional standards . . . and all applicable statutes, regulations, rules, . . . and directives of federal, state, and other governmental regulatory bodies having jurisdiction over [Harris]." However, contract language requiring physicians to comply with hospital policies and procedures and applicable laws, regulations, and safety requirements does not demonstrate a right of control over how they perform their job or affect their status as independent contractors. *Blackburn v. Columbia Med. Ctr. of Arlington Subsidiary*, 58 S.W.3d 263, 270 (Tex. App.—Fort Worth 2001, pet. denied) ("The fact that a physician has staff privileges and agrees to abide by the hospital's policies and procedures while utilizing its equipment and facilities does not affect the physician's status as an independent contractor." (citing *Drennan v. Cmty. Health Inv. Corp.*, 905 S.W.2d 811, 819 (Tex. App.—Amarillo 1995, writ denied) (op. on reh'g))); *see Bell*, 205 S.W.3d at 720 (holding that contract language "requiring [an] independent contractor to comply with [an] employer's standard safety practices and applicable laws" was not

21

sufficient to demonstrate a retained right of control); *see also Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 356 (Tex. 1998) (holding that defendant's insistence that independent contractor observe and comply with federal laws, safety guidelines, and standard safety precautions did not impose unqualified duty of care to ensure contractor's employees did nothing unsafe).

To support his vicarious-liability theory, Davis highlighted the fact that Harris's and Sundance's agreement designated Dr. Leitch as the Medical Director of Harris's anesthesia department. But the agreement bifurcated the Medical Director's responsibilities into "Administrative" and "Non-Administrative" components and made clear that only the Administrative duties were to be "performed in the normal course of [Harris's] business." These Administrative responsibilities included "[a]ssist[ing] with planning, coordinating, and overseeing" the department's "administrative functions" and "[c]ollaborat[ing] with the Department Director" regarding "scope of services, staffing levels, facility space, budget, financial performance and program feasibility, technical and non-director employee job descriptions and qualifications, and performance evaluation standards for such employees." Thus, the agreement clearly delineated Dr. Leitch's Administrative duties, none of which pertained to the implementation or enforcement of policies and procedures in general or medication-handling policies in particular.[15] The absence of

---

[15]At trial, Dr. Leitch agreed that "formulating policies and procedures [was] part of [his] [A]dministrative duties as . . . [M]edical [D]irector," but as shown above,

delineated duties requiring Dr. Leitch in his capacity as Medical Director to oversee Sundance's clinical practice is consistent with the agreement's other provisions making clear that Sundance and its CRNAs and anesthesiologists are free of Harris's control. Therefore, far from showing that the agreement between Harris and Sundance is a mere sham or subterfuge, *see Farlow*, 284 S.W.3d at 911, the provisions detailing Dr. Leitch's responsibilities as Medical Director actually reinforce the agreement's characterization of Sundance and its furnished care providers as independent contractors.

In sum, because Harris's and Sundance's contract expressly provided that Sundance was an independent contractor and because the record contains no evidence demonstrating that "the contract [was] a mere sham or subterfuge designed to conceal the true legal status of the parties," Davis's vicarious-liability theory fails as a matter of law.[16] *See id.*

---

this was not among the Administrative duties explicitly enumerated in the contract between Harris and Sundance. Rather, Dr. Leitch's responsibility to "establish and revise departmental clinical policies, procedures, and protocols" "[i]n collaboration with the Department Director" is classified as Non-Administrative, meaning that (1) this responsibility was not performed in the normal course of Harris's business and (2) Dr. Leitch was not accountable to Harris's president in fulfilling it.

[16]Davis's *Redinger* claim—which, as noted above, he characterized as a direct-negligence claim—fails for the same reasons. *See Bell*, 205 S.W.3d at 718–19 (explaining that in order for *Redinger* liability to attach, an employer must retain a right of control over the manner in which the independent contractor performs its work). In any event, because a hospital may require medical personnel to comply with its policies and procedures while using its equipment and facilities without jeopardizing their status as independent contractors, *see id.* at 720; *Blackburn*, 58 S.W.3d at 270,

### 4. The Evidence Supporting Davis's Direct-Negligence Claim is Legally Sufficient

Harris also contends that there is legally insufficient evidence to support Davis's direct-negligence claim. Specifically, Harris argues that (1) it had no common-law duty to formulate and enforce policies concerning its independent contractors' clinical activities and (2) there was insufficient evidence showing that Harris's negligence caused Angela's injuries. We disagree on both counts.

#### a. Duty

As noted above, a hospital may be liable—irrespective of the negligence of its physicians or employees—if it breaches a duty owed directly to a patient. *LaCroix*, 947 S.W.2d at 950. One such direct duty is the duty to use reasonable care in formulating policies and procedures that govern the hospital's medical staff and nonphysician personnel. *Id.* (citing *Air Shields*, 590 S.W.2d at 576–81); *accord Mills v. Angel*, 995 S.W.2d 262, 267–68 (Tex. App.—Texarkana 1999, no pet.) (op. on reh'g); *see also Chesser v. LifeCare Mgmt. Servs., L.L.C.*, 356 S.W.3d 613, 629 (Tex. App.—Fort Worth 2011, pet. denied); *Reed*, 117 S.W.3d at 409.

Despite acknowledging its direct policy-making duty numerous times in the trial court, Harris argues on appeal that this duty does not extend to "creat[ing] policies governing the details of contracted independent medical practitioners' clinical activities." This argument lacks merit.

Davis's *Redinger* claim was essentially swallowed by his ordinary direct-negligence claim.

First, contrary to what Harris contends, the policy at issue here—a mandatory medication-handling policy for all medical staff and nonphysician personnel, including those in the anesthesia department—does not concern the clinical practice of medicine. Such a policy does not bear upon practitioners' medical decisions regarding diagnosing or treating patients. *See* Tex. Occ. Code Ann. § 151.002(a)(13) (defining "practicing medicine" as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury" by a physician or surgeon). Rather, it merely relates to Harris's responsibility to have adequate systems and processes in place to ensure its patients' safety. *See Tenet Health*, 13 S.W.3d at 470; *see also Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 505 (Tex. 2015) (recognizing that a health care provider has "duties to provide for patient safety").

But even if we were to assume that the medication-handling policy did concern the clinical practice of medicine, the relevant caselaw makes it clear that a hospital's policy-making and enforcement duty extends to clinical activities. *See Chesser*, 356 S.W.3d at 634 (concluding that evidence was sufficient to support finding that hospital management company was negligent for, inter alia, failing to formulate "policies and procedures governing care of patients post-PEG tube insertion" and failing to enforce "policies requiring a nursing care plan for every patient"); *LaCroix*, 947 S.W.2d at 949–56 (addressing policies involving preanesthesia evaluation and supervision of anesthesia care); *Air Shields*, 590 S.W.2d at 581–82 (concluding that evidence was sufficient to support finding that hospital was negligent in its policies

25

and procedures regarding the administration of supplemental oxygen to premature infants).

Further, the care providers' status as independent contractors is irrelevant to Davis's direct-negligence claim. It is not uncommon for hospitals to require physicians to comply with their policies and procedures while utilizing their equipment and facilities, and we have held that a hospital may impose such a requirement without jeopardizing care providers' status as independent contractors. *See Bell*, 205 S.W.3d at 720; *Blackburn*, 58 S.W.3d at 270. Here, as noted above, Harris's agreement with Sundance expressly required Sundance and all of its anesthesiologists and CRNAs providing coverage services to "comply with [Harris's] policies and procedures in all material respects." Indeed, Dr. Leitch acknowledged that Harris "ha[d] the ability and the authority to require [him] to follow its procedures," and both Goforth and Tucker testified that if Harris had implemented a medication-handling policy that applied to the anesthesia department, they would have abided by it.

In *LaCroix*, we recognized—tacitly, if not explicitly—that a hospital's direct policy-making duty included an obligation to create and enforce policies governing the details of independently contracted anesthesiologists' and CRNAs' clinical activities, and Harris's attempts to distinguish this case are unavailing. The *LaCroix* plaintiffs asserted a medical-malpractice claim against a hospital arising from an anesthesia error in the labor-and-delivery department that had caused hypoxia and irreversible brain

26

damage to the patient. 947 S.W.2d at 944–46. The hospital had contracted with an anesthesia group to serve as its exclusive anesthesia provider for the labor-and-delivery department. *Id.* at 943. Even though the hospital had a written anesthesia-care policy providing that a CRNA could only provide care under a physician's "direct and personal supervision," its contract with the anesthesia group did not require anesthesiologists to supervise the CRNAs in person and instead only required them to be on-call and available to respond within thirty minutes. *Id.* Recognizing that the hospital owed a direct duty to use reasonable care in formulating and enforcing policies and procedures governing its medical staff, we concluded that the evidence was sufficient to support the jury's finding that the hospital's breach of its duty to enforce its policy requiring an anesthesiologist to provide or supervise the patient's anesthesia care had proximately caused her brain injury. *Id.* at 950, 956.

Misconstruing *LaCroix*, Harris argues that it is distinguishable because (1) unlike Harris, the hospital had—by virtue of its enaction of a policy requiring CRNAs to be personally supervised by an anesthesiologist—assumed a duty to enforce service providers' compliance with that policy and (2) Davis's direct-liability claim differs from the one asserted by the *LaCroix* plaintiffs because it is, in essence, a negligent-supervision claim. These arguments are unpersuasive.

Harris's first argument confuses the origin of a hospital's general duty to formulate and enforce policies with the specific manner of breach. Contrary to what Harris contends, the *LaCroix* hospital did not "assume" a duty by enacting its

27

mandatory-supervision policy; rather, its duty to use reasonable care in enforcing its policies arose from the common law. *See id.* at 950; *see also Chesser*, 356 S.W.3d at 629; *Reed*, 117 S.W.3d at 409; *Mills*, 995 S.W.2d at 267–68. Although the specific breach alleged in *LaCroix* (i.e., that the hospital had failed to enforce its mandatory-supervision policy) differs from the breach alleged in the present case (i.e., that Harris failed to formulate and enforce a medication-handling policy that applied to its anesthesia department), this is a distinction without a difference as far as the scope of Harris's policy-making duty is concerned.

Harris's second argument is, at best, confusing. Seizing upon our statement in *LaCroix* that the plaintiffs claimed "that the hospital had and breached a *direct* duty to [the patient] . . . [,] not that the hospital [had] negligently supervised [the] anesthesiologists and CRNAs," 947 S.W.2d at 949 n.6, Harris attempts to distinguish Davis's claim by portraying it as a negligent-supervision claim. The gist of Harris's argument appears to be that because Davis asserts that Harris had a duty not only to create a medication-handling policy but also to enforce that policy, his direct-negligence claim is—in substance—a negligent-supervision claim. But Harris's argument ignores the fact that the *LaCroix* plaintiffs' claim was also premised upon the hospital's failure to enforce a policy, not merely to formulate one. *Id.* at 946. Thus, even if we were to accept Harris's dubious assertion concerning the nature of Davis's claim (and we do not), this would not be a point of distinction between *LaCroix* and the present case.

28

In sum, Harris had a duty to use reasonable care in formulating policies and procedures governing its medical staff and nonphysician personnel. *See id.* at 950; *see also Chesser*, 356 S.W.3d at 629; *Reed*, 117 S.W.3d at 409; *Mills*, 995 S.W.2d at 267–68. The caselaw makes clear that a hospital may require independent contractors to comply with its policies while using its facilities and equipment. *See Bell*, 205 S.W.3d at 720; *Blackburn*, 58 S.W.3d at 270; *see also LaCroix*, 947 S.W.2d at 943, 956. Further, even if—as Harris maintains—the medication-handling policy at issue in this case concerns the clinical practice of medicine, this does not preclude Davis's direct-negligence claim under the facts of this case. *See Chesser*, 356 S.W.3d at 634; *LaCroix*, 947 S.W.2d at 949–56; *Air Shields*, 590 S.W.2d at 581–82. Accordingly, we reject Harris's argument that it had no duty to formulate or enforce a medication-handling policy that applied to its independently contracted anesthesiologists and CRNAs.

### b. Causation

Harris also contends that there is legally insufficient evidence to show a causal relationship between Harris's alleged negligence and Angela's injuries. The crux of Harris's causation argument is that because there were two equally likely errors that could have occurred and because the implementation of a double-verification medication-handling policy would have prevented only one of them, Davis cannot prove by a preponderance of the evidence that Harris's failure to implement such a

29

policy proximately caused Angela's injuries.[17]   In other words, Harris asserts that because (1) a policy requiring all medication labels to be double verified would have only prevented Tucker from mislabeling the syringes but would not have prevented Goforth from misreading the labels and (2) it is impossible to know for sure which error occurred—meaning that the probability of either error's being the cause of Angela's injuries is only fifty percent—Davis cannot show by a preponderance of the evidence that Harris's negligence caused Angela's injuries.  But when viewed in the light most favorable to the jury's negligence finding, the record contains legally sufficient evidence of causation.  *See Wise Elec. Coop., Inc. v. Am. Hat Co.*, 476 S.W.3d 671, 687 (Tex. App.—Fort Worth 2015, no pet.).

Harris's claim that the two potential errors were equally likely is based on isolated excerpts from the causation experts' testimonies.  But Harris ignores the substantial amount of other evidence indicating that it was more likely that Tucker mislabeled the syringes than that Goforth administered the wrong, but properly labeled, medication.  For example, Harris's own expert Dr. Dorman agreed that if

---

[17]Harris also contends that the jury's findings that Goforth, Tucker, and Dr. Leitch were either not negligent or not a proximate cause of Angela's injuries shows that there was legally insufficient evidence demonstrating that Harris's failure to implement a medication-handling policy caused Angela's injuries.  However, the jury's findings that the individual care providers were not negligent is immaterial to the issue of Harris's direct liability.  *See LaCroix*, 947 S.W.2d at 949.  Further, when viewed in conjunction with the jury's findings that Harris's and Sundance's negligence proximately caused Angela's injuries, the jury's declination to find the individual medical providers culpable does not necessarily mean that they thought that the causation evidence was insufficient; rather, it simply shows that they believed that ultimate responsibility for the incident rests with Harris and Sundance.

Goforth erred by misreading the labels, she did so at two different times—once when administering what she thought was bupivacaine and again when administering what she believed to be tranexamic acid—and concluded that it was therefore more likely that Tucker had made the error when filling the syringes. Davis's expert Dr. Kaye testified that because medication errors are very rare, it is more likely that Tucker made a single swap error when preparing the syringes than that Goforth made two errors when reading the labels and administering the medications. Indeed, another of Davis's experts, Dr. Abookire, and Harris's statistics expert, Dr. Shavelle, confirmed that if the odds of one medication error occurring are one in a thousand, the odds of two such errors occurring are one in a million.[18] In addition, the jury heard Harris's interrogatory response in which it acknowledged that although it was "not absolutely certain" what had caused Angela's injuries, it "believed that the syringe for bupivacaine [had been] inadvertently switched by . . . Tucker with the syringe for tranexamic acid when the medications were removed from their vials." Based on this record, there is some evidence from which the jury could have reasonably concluded that it was more likely that Tucker had mislabeled the syringes than that Goforth had twice misread the labels and administered the wrong, but correctly labeled, medication.

---

[18]Dr. Shavelle clarified that for these statistical odds to apply, the two errors would have to be independent, unrelated events. He surmised that two errors made by the same nurse may be related but acknowledged that such a causation question was outside his area of expertise.

31

Further, there is some evidence indicating that even if Goforth misread the labels,[19] this error could have been prevented by Harris's implementation of a medication-handling policy. If Harris had implemented a double-verification medication-handling policy, Goforth would have been prohibited from using the syringes that had been prefilled by Tucker without being doubly verified and instead would have been required to draw and administer the medication herself without a break in the process. When a medication is drawn and administered in this manner, there is virtually no possibility of a drug-swap error.[20]

Viewed in the light most favorable to the verdict, the record contains more than a scintilla of evidence to support a finding that Harris's failure to implement and enforce a double-verification medication-handling policy proximately caused Angela's injuries. *See EAN Holdings, LLC v. Arce*, 636 S.W.3d 290, 294 (Tex. App.—Fort Worth 2021, pet. denied); *Dunn*, 2019 WL 3024479, at *3. Thus, the evidence of causation is legally sufficient. *See Gunn*, 554 S.W.3d at 658.

---

[19]In its briefing, Harris asserted that Davis had amended his petition to disregard the possibility that Goforth had misread the labels. But Davis's live pleading appears to allow for both possibilities as it simply alleges that "Goforth . . . injected a medication she thought was bupivacaine into . . . [Angela's] spinal column, but it was actually tranexamic acid" and that Harris had a duty to formulate and enforce a medication-handling policy designed "to avoid drug-swap and wrong medication errors."

[20]Indeed, Dr. Leitch and Harris's Chief Medical Officer Mark Montgomery testified that after the events giving rise to this case, a new policy was implemented prohibiting CRNAs from drawing up medications in advance and requiring them instead to draw each medication "out of the vial directly onto the tray" at the time it is administered so that there is no "break in the chain."

### 5. Disposition of Harris's Second Issue

Having determined that the evidence is legally sufficient to support Davis's direct-liability claim, we overrule Harris's second issue.

## B. The Trial Court Abused Its Discretion by Admitting the CMS Conditions and Testimony Concerning These Regulations

In its first issue, Harris asserts that the trial court abused its discretion by admitting the CMS Conditions and testimony concerning these regulations. Specifically, Harris contends that by admitting these federal regulations as evidence of the applicable standard of care and allowing Davis's standard-of-care expert to rely on them as a basis for her opinions, the trial court essentially instructed the jury that under federal law, Harris was legally responsible for Angela's injuries regardless of whose error caused them—even if the negligent person (or entity) was an independent contractor under Texas agency law. Thus, according to Harris, the CMS Conditions and the testimony concerning them were irrelevant and any probative value that this evidence might have had was substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. *See* Tex. R. Evid. 401–03. For the reasons set forth below, we agree that the trial court abused its discretion by admitting this evidence.

### 1. Standard of Review

We review a trial court's ruling in admitting or excluding evidence under an abuse of discretion standard. *Richmond Condos. v. Skipworth Com. Plumbing, Inc.*, 245

33

S.W.3d 646, 664–65 (Tex. App.—Fort Worth 2008, pet. denied) (op. on reh'g) (citing *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000) (op. on reh'g)). A trial court abuses its discretion in admitting or excluding evidence if it acts without reference to any guiding rules and principles or if the act complained of is arbitrary and unreasonable. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex. 2002) (op. on reh'g); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

To obtain reversal of a judgment based on the erroneous admission or exclusion of evidence, an appellant must show not only that the trial court's ruling was in error but also that the error probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1); *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000); *Ledbetter v. Mo. Pac. R.R. Co.*, 12 S.W.3d 139, 142 (Tex. App.—Tyler 1999, pet. denied). This standard does not require the complaining party to prove that but for the evidentiary ruling a different judgment would necessarily have resulted. *Tex. Health Harris Methodist Hosp. Fort Worth v. Featherly*, 648 S.W.3d 556, 577 (Tex. App.—Fort Worth 2022, pets. denied) (citing *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018)). Rather, if erroneously admitted or excluded evidence was crucial to a key issue, the error is likely harmful. *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008). Determining whether a particular error is harmful depends on the particular case. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). In making this determination, we review the entire record. *Id.*

## 2. Admission of the CMS Conditions and Related Testimony

At trial, Davis offered—and the trial court admitted—Section 482.12(e) of the CMS Conditions into evidence. *See* 42 C.F.R. 482.12(e). Significantly, as shown below, Section 482.12(e) has nothing to do with the double-verification medication-handling policy that Davis asserted Harris was required to implement under the applicable standard of care; rather, it solely concerns hospitals' responsibility for services provided at their facilities—even those furnished by independent contractors. *See id.*

Section 482.12 provides that to be eligible to participate in Medicare or Medicaid, a hospital must have "an effective governing body that is legally responsible for the conduct of the hospital." *See generally id.* § 482.12. Section 482.12(e), which addresses standards for contracted services, specifies that a hospital's

> governing body *must be responsible* for services furnished in the hospital *whether or not they are furnished under contracts.* The governing body *must ensure* that a contractor of services (including one for shared services and joint ventures) furnishes services that permit the hospital to comply with all applicable conditions of participation and standards for the contracted services.
>
> (1) The governing body *must ensure* that the services performed under a contract are provided in a safe and effective manner.
>
> (2) The hospital must maintain a list of all contracted services, including the scope and nature of the services provided.

*Id.* § 482.12(e) (emphases added).

The trial court also admitted the State Operations Manual's interpretive guidelines for Section 482.12(e). These guidelines state, in relevant part, that

> [t]he governing body has the responsibility for *assuring* that hospital services are provided in compliance with the Medicare Conditions of participation and according to acceptable standards of practice, *irrespective of whether the services are provided directly by hospital employees or indirectly by contract*. [Emphasis added.]

In addition to introducing into evidence the regulations and interpretive guidelines themselves, Davis extensively questioned many witnesses about them. For example, Davis elicited the following testimony from Dr. Dorman,[21] one of the standard-of-care experts:

> Q. In order to participate in Medicare and Medicaid, the governing body of the hospital is required to be responsible for everything that contracted services does, correct?
>
> A. Everything, yes.
>
> . . . .
>
> Q. Do you know what Medicare -- what's required under Medicare and Medicaid as a condition of participation with regard to responsibility and oversight for contracted services?
>
> A. As far as I can remember, they're responsible to assure that the contracted service is compliant with Medicare conditions of participation.
>
> Q. And isn't it true that they're -- they have the exact same responsibility for their contracted services as they do for their employed services?
>
> A. Correct.

---

[21]Dr. Dorman was not physically present at trial; rather, his video deposition was played for the jury.

Q.     Do you agree that the standard for contracted services says, "The governing body must be responsible for services furnished in the hospital whether or not they are furnished under contracts[]?[']"

A.     Correct.

Q.     "The governing body must ensure that a contractor of services, including one for shared services and joint ventures, furnishes services that permit the hospital to comply with" -- "permit the hospital to comply with all applicable conditions of participation and standards for the contracted services[]?[']"

A.     Yes.

Q.     And it says, "The governing body must ensure that the services performed under a contract are provided in a safe and effective manner," correct?

A.     Correct.

Q.     So, I mean, you agree with me that *this hospital . . . cannot avoid responsibility in this case by simply saying, Oh, it was a contractor that screwed up.*

*That's not -- that's not a defense, is it?*

A.     *Correct.*

. . . .

Q.     Does your analysis in this case take into account the fact that in Texas it is the hospital itself that is responsible for formulating the policies and procedures, particularly those that are required by The Joint Commission for the hospital to comply with?

A.     Yes.  And with the caveat that that can be delegated to the contract service to do that.

Q.     And did you know that in the state of Texas and under the law, that even though it's delegated *under federal law*, in fact, *the hospital's governing body remains ultimately legally responsible?*

A.     *Yes.*

. . . .

Q. You know that Section 282.12, conditions of participation states that "There must be an effective governing body that is *legally responsible* for the conduct of the hospital."

A. Okay.

Q. Okay. That's all I'm trying to ask.

A. Yeah.

Q. Did you know that *federal law requires* a hospital's governing body to ensure, quote, "The clear expectations for safety are established" --

A. Yes.

Q. -- "to reduce medication errors[]?[']"

A. Yes.

. . . .

Q. But do you disagree that *the governing body is legally responsible for the conduct of their delegees?*

A. Well, *that's what the standard requires.* [Emphases added.]

In addition, Davis's standard-of-care expert Dr. Abookire testified that under Section 482.12(e) and the interpretive guidelines, Harris was "100 percent" required to "assur[e] that hospital services [were being] provided in compliance with the Medicare conditions of participation and according to acceptable standards of practice, irrespective of whether the services [were] provided directly by . . . hospital employees or indirectly by contract." Dr. Abookire explained to the jury that under Section 482.12(e),

38

*hospitals and their governing boards . . . are accountable for the care that goes on in their hospital, period*, regardless of whether they're providing that [care] directly through employees or whether they have a contracted service.

Even if they contract out the anesthesia service or the radiology service or whatever, they can contract out certain services that they don't want to bring in-house and employ directly. But even when they do that, they are still accountable for the quality of care provided by that service.

And that is well-known to hospital leaders that *they cannot, you know, shift the blame to the contracted service or blame the CRNAs. They are accountable.* And that's part of the leadership standard and structure that hospital leaders are well aware of and operate by. And then, again, backed up by multiple sources of regulatory standards such as [Section 482.12(e)]. [Emphases added.]

Dr. Abookire even went so far as to identify the CMS Conditions with the applicable standard of care, opining that "the standard of care for all hospitals[, or at least] one standard of care[,] is that they obey . . . the conditions of participation."

Davis also examined Dr. Montgomery regarding the CMS Conditions. After confirming that he was familiar with the regulations, Dr. Montgomery—predicated on the assumption that the CMS Conditions applied—testified as follows:

Q.    And would you agree that it says right here that "The governing body of the hospital must be responsible for services furnished in the hospital whether or not they are furnished under contracts[]?[']

A.    Yes, that's what it says.

Q.    Okay. So can we tell this jury -- would it be fair to tell this jury that *there is no distinction between contracts, anesthesiologists, CRNAs*? It's still the hospital's responsibility?

A.    Correct. [Emphasis added.]

39

Davis also questioned Dr. Montgomery regarding other sections of the CMS Conditions, including Sections 482.21, .23, and .25 and asked him whether he "fe[lt] bad" about not having a medication-handling policy that Davis asserted was required by "federal regulations."

During closing argument, Davis highlighted the CMS Conditions and related testimony, reminding jurors of "[t]hese federal regulations that say that [a hospital is] responsible for [its] contracted services" and Dr. Dorman's testimony that "the hospital's ultimately responsible." Davis also implied that the CMS Conditions imposed vicarious liability on hospitals for contracted services' negligence:

> Now, over and over you saw all kinds of things in this trial talking about what the hospital's responsibilities are for contracted services. And, basically, when you go back and you read them all, there's no distinction. The -- the standards of safety that apply in a hospital are there for the patient, and it doesn't matter who's performing those services. It can be a contractor, it can be a hospital staff employee, and the hospital can't stand in front of you and say, Well, those are professionals. We wash our hands of it. *Because the law says that they cannot do that. They cannot do that.* [Emphasis added.]

### 3. Harris's Objections and Error Preservation

Harris repeatedly objected—both before and during trial—to the admission of the CMS Conditions and any testimony concerning them on relevance and Rule 403 grounds. *See* Tex. R. Evid. 401–03. As early as the November 2021 pretrial conference, Harris raised the issue of the CMS Conditions' admissibility via a motion to exclude evidence under Rule 104 in which it argued that the CMS Conditions and any testimony pertaining to them should be excluded because such evidence's

40

probative value was "substantially outweighed by a danger of unfair prejudice to [Harris], confusing the issues . . . , and misleading the jury."[22] *See* Tex. R. Evid. 104, 403. In addition, Harris filed a motion to strike Dr. Abookire's expert testimony equating certain CMS Conditions with the applicable standard of care. The trial court signed orders denying both of these pretrial motions on March 3, 2022.

During trial, Harris objected to Dr. Abookire's testifying about the CMS Conditions and to the admission of any documents pertaining to them—including the proffered excerpts from the regulations themselves. The trial court overruled these objections and granted Harris a running objection. Harris also objected to Davis's use of the CMS Conditions during his cross-examination of Dr. Montgomery. Again these objections were overruled, and a running objection was granted. In addition, Harris filed written objections seeking the exclusion of Dr. Dorman's videotaped testimony containing references to the CMS Conditions on the grounds that it conflated the CMS Conditions with the standard of care and was thus irrelevant and likely to confuse the jury. *See* Tex. R. Evid. 401–03. Harris raised the same objections

---

[22]Harris's argument during the pretrial hearing made clear that it objected to the CMS Conditions' admission on relevance grounds as well:

> [The CMS Conditions] have nothing to do with establishing the standard of care or -- or altering what the standards of state tort law is regarding agency. [They are] not going to make . . . you, as a hospital, vicariously responsible, or the agent of the independent contractor group that you contracted with.

in court prior to the playing of Dr. Dorman's testimony, but the trial court overruled Harris's objections and granted a running objection.

Thus, Harris timely, diligently, and consistently objected to the admission of the CMS Conditions—and any testimony or documentary evidence pertaining to them—and stated specific grounds for its objections. *See* Tex. R. Evid. 103(a)(1); *see also Edgeworth v. Wilson*, 113 S.W.3d 559, 562 (Tex. App.—Texarkana 2003, no pet.) (admonishing that "a party should object every time inadmissible evidence is offered; otherwise, any error in overruling a previous objection is cured"). Although this is generally sufficient to preserve error, *see* Tex. R. App. P. 33.1(a); Tex. R. Evid. 103(a)(1), Davis contends that Harris waived its evidentiary complaint by failing to request a limiting instruction, *see* Tex. R. Evid. 105(b)(1). We disagree.

Davis argues that because the CMS Conditions were relevant to—but not determinative of—whether Harris had violated the standard of care and whether Sundance and Dr. Leitch were Harris's agents, Harris was required to request a limiting instruction advising the jury that the CMS Conditions "[were] not determinative" on these issues in order to preserve error. *See* Tex. R. Evid. 105(b)(1). But Davis's argument misconstrues the nature of Harris's objections. Under Rule 105(b), a limiting instruction is required to preserve error only when the court "admit[s] evidence that is admissible . . . for [one] purpose . . . but not . . . for another purpose." *Id.* But Harris did not concede that the CMS Conditions were admissible for any purpose; rather, it argued (correctly) that Davis's purpose for offering them

42

into evidence—to show that Harris had an overarching right of control over Sundance and Dr. Leitch and had therefore violated the standard of care—was not proper. Thus, Davis's suggested limiting instruction—which merely addresses the weight to be given to the CMS Conditions, not the purpose for which they were admitted—would not have cured the fundamental problem underlying Harris's objection.[23]

Accordingly, we conclude that Rule 105(b)(1) is inapplicable and that Harris's myriad timely and specific objections were sufficient to preserve its complaint regarding the admission of the CMS Conditions and any testimony concerning them. *See* Tex. R. App. P. 33.1(a); Tex. R. Evid. 103(a)(1); *see also Mock v. Nat'l Collegiate Student Loan Tr. 2007-4*, No. 01-17-00216-CV, 2018 WL 3352913, at *3 (Tex. App.—Houston [1st Dist.] July 10, 2018, no pet.) (mem. op.) ("To preserve error in a trial court's ruling to admit evidence, the complaining party must normally make a timely

---

[23]Even if we were to broadly construe Davis's preservation argument as a contention that Harris was required to request a limiting instruction to preserve its Rule 403 objection if the CMS Conditions were at all relevant, *see Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 365 (Tex. 1987), we would nevertheless be required to consider the efficacy of such a limiting instruction, *see Lopez v. State*, 288 S.W.3d 148, 165 (Tex. App.—Corpus Christi–Edinburg 2009, pet. ref'd); *cf. Russell v. State*, 113 S.W.3d 530, 545 (Tex. App.—Fort Worth 2003, pet. ref'd) (recognizing that certain types of evidence cannot "be filed away in some compartment of the mind and considered for only a limited purpose"). Given Davis's purpose in offering the CMS Conditions—to effectively erase important distinctions in Texas law between employees and independent contractors—and his argument to the jury that these regulations were "the law," we cannot conclude that a limiting instruction would have been efficacious. "[I]f you throw a skunk into the jury box, you can't instruct the jury not to smell it." *Dunn v. U.S.*, 307 F.2d 883, 886 (5th Cir. 1962).

and specific objection and obtain a ruling from the trial court." (first citing Tex. R. App. P. 33.1(a); and then citing Tex. R. Evid. 103(a)(1))). Having determined that error was preserved, we turn to the merits of Harris's evidentiary complaint.

### 4. Analysis

"To be admissible under the Texas Rules of Evidence, evidence must be relevant to the issues in the case." *Trencor, Inc. v. Cornech Mach. Co.*, 115 S.W.3d 145, 152 (Tex. App.—Fort Worth 2003, pet. denied) (citing Tex. R. Evid. 402). "Evidence is 'relevant' if 'it has any tendency to make a fact of consequence to the action more or less probable than it would be without the evidence.'" *In re N. Cypress Med. Ctr. Operating Co.*, 559 S.W.3d 128, 131 (Tex. 2018) (orig. proceeding) (quoting Tex. R. Evid. 401). Whether a fact is "of consequence" is determined by the parties' pleadings. *See San Antonio Traction Co. v. Higdon*, 123 S.W. 732, 734 (Tex. App.—San Antonio 1909, writ ref'd); *see also In re Allstate Fire & Cas. Ins. Co.*, 617 S.W.3d 635, 643 (Tex. App.—Houston [14th Dist.] 2021, orig. proceeding) ("Determining which facts are 'of consequence' to the action necessarily begins with a review of the pleadings."). The test for relevance is satisfied if there is directly, or by inference, some logical connection between the evidence and the fact to be proven. *Republic Waste Servs., Ltd. v. Martinez*, 335 S.W.3d 401, 406 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Boswell v. Brazos Elec. Power Coop., Inc.*, 910 S.W.2d 593, 601 n.3 (Tex. App.—Fort Worth 1995, writ denied)).

But even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Tex. R. Evid. 403; *Pack v. Crossroads, Inc.*, 53 S.W.3d 492, 500 (Tex. App.—Fort Worth 2001, pet. denied). "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 549 (Tex. 2018). "'Confusion of the issues' means 'a tendency to confuse or distract the jury from the main issues in the case.'" *Nguyen v. State*, No. 02-23-00168-CR, 2024 WL 1451977, at *6 (Tex. App.—Fort Worth Apr. 4, 2024, pet. filed) (mem. op., not designated for publication) (quoting *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006)).[24] "'Misleading the jury' 'refers to a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds'—for example, scientific evidence that could mislead a jury 'that is not properly equipped to judge the probative force of the evidence.'" *Id.*; *see also In re Commitment of Summers*, No. 01-19-00738-CV, 2021 WL 3776751, at *8 (Tex. App.—Houston [1st Dist.] Aug. 26, 2021, no pet.) (mem. op.). "When determining [the] admissibility of evidence under Rule 403, trial judges must balance the probative value of the evidence against relevant countervailing factors." *JBS Carriers, Inc.*, 564 S.W.3d at 836.

---

[24]Because Rule 403 applies in both civil and criminal cases, we may look to decisions in criminal cases for guidance in its interpretation. *Cf. In re D.T.*, 625 S.W.3d 62, 72 (Tex. 2021) (looking to criminal law to review similar concepts); *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 147 (Tex. 2012) (finding guidance in the decisions of the Court of Criminal Appeals).

Davis offered the CMS Conditions to support his vicarious-liability theory by showing (1) that Harris had retained a right of control[25] over Sundance and Dr. Leitch and (2) that under the applicable standard of care, Harris was ultimately responsible for their actions (or inaction). But as shown above, Davis's vicarious-liability theory is invalid under Texas law. Thus, the admission of the CMS Conditions served no purpose other than to impute liability to Harris for Sundance's and Dr. Leitch's negligence in contravention of Texas agency law even though, as discussed in greater detail below, the CMS Conditions do not purport to preempt state laws regarding agency, to impose tort liability, or to create a nondelegable duty for hospitals to provide competent medical care to their patients. *See* 42 C.F.R. § 482.1(b) ("[T]he provisions of this part serve as the basis of survey activities for the purpose of determining whether a hospital qualifies for a provider agreement under Medicare and Medicaid."). Accordingly, even if we were to assume that the CMS Conditions were at least minimally relevant, *see* Tex. R. Evid. 401, their slight probative value was substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury, *see* Tex. R. Evid. 403; *JBS Carriers, Inc.*, 564 S.W.3d at 836.

Davis contends that under Texas law, the CMS Conditions are relevant to—but not determinative of—the issue of the applicable standard of care. *See, e.g.*, *Hernandez*

---

[25]Harris's purported right of control over Sundance and Dr. Leitch was also a key element of Davis's *Redinger* claim. *See Redinger*, 689 S.W.2d at 418. But as noted above, this claim—like Davis's vicarious-liability theory—was not legally viable. *See supra* note 16.

*v. Nueces Cnty. Med. Soc'y Cmty. Blood Bank*, 779 S.W.2d 867, 871 (Tex. App.—Corpus Christi–Edinburg 1989, no pet.) (recognizing that "[i]t is well-established that state health regulations, national standards, and organizational bylaws are admissible to define the standard of care customarily offered" but noting that "such evidence does not *usually* conclusively establish that a health care provider fulfilled its duty of care" and "is only one factor to consider"); *see also Doe v. Kerrville I.S.D.*, SA-21-CV-00369-XR, 2023 WL 5313889, at \*6 (W.D. Tex. Aug. 16, 2023) (order) ("Experts routinely opine on the standard of care; references to statutes and administrative regulations is one method of establishing a standard of care.").

But as Harris points out, numerous courts around the country have held that because the CMS Conditions' self-described limited purpose—to determine whether a hospital qualifies as a provider under Medicare and Medicaid—has nothing to do with state tort liability, they are wholly irrelevant to the standard-of-care issue:

- *Blackmon v. Tenet Healthsystem Spalding, Inc.*, 653 S.E.2d 333, 340 (Ga. Ct. App. 2007) (rejecting appellant's argument that the CMS Conditions provided a basis to impose liability on a hospital because they "do[] not purport to impose state tort liability on hospitals for the negligence of their independent contractors" and clarifying that whether a hospital was liable under state agency law was "wholly different" from whether it was complying with Medicare reimbursement regulations), *rev'd in part on other grounds*, 667 S.E.2d 348 (Ga. 2008);

- *Godwin v. Univ. of S. Fla. Bd. of Trs.*, 203 So. 3d 924, 931–32 (Fla. Dist. Ct. App. 2016) (rejecting appellant's argument that the CMS Conditions created a nondelegable duty for a hospital because they "do[] not purport to diminish or preempt state laws dealing with the traditional common-law theories of principal/agent and independent contractors");

47

- *Tiplady v. Maryles*, 120 A.3d 528, 543 (Conn. App. Ct. 2015) (rejecting appellant's argument that the trial court had erred by striking a portion of her complaint alleging that the CMS Conditions create a nondelegable duty for a hospital "to ensure that independently contracted physicians do not conduct malpractice" because the regulations' stated purpose is determining whether a hospital qualifies as a provider under Medicare and Medicaid);

- *DeHart v. Jones*, 310 So. 3d 658, 696 (La. Ct. App. 2020) (holding that the "CMS[] Conditions['] informed consent standards, as adopted by [the hospital], do not impose tort liability upon [the hospital] as a result of the surgical staff's failure to ensure that [the plaintiff's] informed consent form was properly filled out" (citing *Godwin*, 203 So. 3d at 931–32));

- *Smith v. Surgery Ctr. at Lone Tree, LLC*, 484 P. 3d 745, 755–57 (Colo. App. 2020) (holding that CMS Conditions do not establish standards of medical care and cannot serve as the basis for a negligence per se claim).

Given the persuasiveness of these authorities, we conclude that even if the CMS Conditions are relevant in some sense to the standard-of-care issue, their probative value in this regard is minimal.[26]

---

[26]The following overriding principle can be gleaned from the cases upon which Davis relies to support his contention that the CMS Conditions are relevant to the standard-of-care issue: the determining factor regarding an administrative regulation's relevance in a particular case is whether it sets forth an actual, applicable clinical standard regarding patient care. *See Reddic v. E. Tex. Med. Ctr. Reg'l Health Care Sys.*, 474 S.W.3d 672, 676 (Tex. 2015) (acknowledging that "applicable regulations in some instances might bear on or evidence a standard of care" but noting that the appellee hospital had not "identif[ied] a commission or agency regulation that it sa[id] evidence[d] a particular standard of care that both [was] substantively related to the provision of health care and underlie[d] [appellant's] claim"); *Hernandez*, 779 S.W.2d at 868 (considering clinical guidelines promulgated by the American Association of Blood Banks that directly related to the provision of patient care); *Kissinger v. Turner*, 727 S.W.2d 750, 756 (Tex. App.—Fort Worth 1987, writ ref'd n.r.e.) (holding that trial court did not err by excluding federal Medicare–Medicaid regulations because, inter alia, the plaintiff was not a Medicare or Medicaid patient and the regulations did not establish a standard of care for medical practice generally); *Hickson v. Martinez*, 707 S.W.2d 919, 927 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) (holding that trial court

Nor do the regulations appear to have any relevance whatsoever regarding whether Harris retained a right of control over Sundance and Dr. Leitch. As discussed above, under Texas agency law, even though a contract purports to create an independent-contractor relationship, the parties' relationship may nevertheless give rise to a respondeat superior claim if the principal retains a right of control over the contractor's work. *See Farlow*, 284 S.W.3d at 911. This right of control may be proven by two types of evidence: (1) other language within the parties' contract or (2) extrinsic evidence showing "instances of actual control by the principal." *Id.* But the CMS Conditions do not fall into either of these two categories. Thus, given that they do not purport to preempt state agency laws or to impose tort liability, *see* 42 C.F.R. § 482.1(b); *Godwin*, 203 So. 3d at 931–32; *Blackmon*, 653 S.E.2d at 340, we fail to see how the CMS Conditions could have any relevance to the right-of-control issue. Texas law is clear that a principal's right of control must be based on either the terms of the contract with the purported agent or a pattern of conduct, *see Farlow*, 284 S.W.3d at 911; whether a hospital is in compliance with the CMS Conditions for purposes of participating in Medicare and Medicaid has no bearing on this issue, *see Blackmon*, 653 S.E.2d at 340. Accordingly, to the extent that the CMS Conditions had any relevance on the right-of-control issue, it solely pertained to Davis's effort to

erred by excluding federal regulation specifically requiring hospitals to obtain an adequate medical history where the appellants had alleged that the hospital and the care providers were negligent precisely for having failed to do so). The CMS Conditions at issue here do not set forth such a clinical standard. Thus, to the extent they have any relevance, it is minimal.

49

erase important distinctions in Texas law between employees and independent contractors; this is not a valid basis for their admission.

Whatever slight probative value the CMS Conditions might possess is substantially outweighed by the danger of misleading the jury into believing that the CMS Conditions imposed vicarious liability on Harris by creating a nondelegable duty[27] for Harris to provide competent medical care to its patients or otherwise preempting Texas agency law. *See* Tex. R. Evid. 403; *JBS Carriers, Inc.*, 564 S.W.3d at 836. Courts have routinely recognized that admitting regulations that are only tangentially related to a plaintiff's negligence claim poses a significant danger of misleading the jury because of the tendency for jurors to place undue emphasis on such regulations. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 672–73 (5th Cir. 1999) (holding that trial court did not abuse its discretion by excluding testimony

---

[27]"[W]hen a duty is imposed by law due to public safety concerns, and the imposition expressly identifies the party to bear the duty so imposed, the party cannot avoid its responsibility by delegating it to another not so expressly identified." *In re Gamble*, 676 S.W.3d 760, 785 (Tex. App.—Fort Worth 2023, orig. proceeding) (first citing *Fifth Club, Inc.*, 196 S.W.3d at 795; and then citing *MBank El Paso, N.A. v. Sanchez*, 836 S.W.2d 151, 153 (Tex. 1992)). Such duties are considered "nondelegable." O'Connor's Texas Causes of Action ch. 38-E (2022) (first citing *MBank El Paso*, 836 S.W.2d at 153; and then citing *Edwards v. Hammerly Oaks, Inc.*, 908 S.W.2d 270, 273 (Tex. App.—Houston [1st Dist.] 1995), *aff'd as modified*, 958 S.W.2d 387 (Tex. 1997)). Under the theory of nondelegable duty, even if a principal assigns the responsibility for performing the duty to an independent contractor, the principal remains liable for any negligence in the performance of the duty. *Gamble*, 676 S.W.3d at 785 (quoting *Collins v. Vivanco*, 603 S.W.3d 843, 848 (Tex. App.—El Paso 2020, no pet.)). "A claim brought against a party based on a nondelegable duty is one of vicarious liability, not direct." *McAllen Hosps., L.P. v. Gonzalez*, 566 S.W.3d 451, 457 n.3 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.).

regarding environmental regulations "because the probative value of the evidence was outweighed by its potential for prejudice"); *Sprankle v. Bower Ammonia & Chem. Co.*, 824 F.2d 409, 416–17 (5th Cir. 1987) (holding that district court did not abuse its discretion by excluding OSHA regulations under Fed. R. Evid. 403 because "the danger of the jury placing undue emphasis on the . . . regulations substantially outweighed their probative value"); *Varnell v. Serv. Merch. Co.*, 613 So. 2d 1042, 1043–44 (La. Ct. App. 1993) (upholding trial court's ruling excluding OSHA regulations on the grounds that "their prejudicial effect would outweigh their probative value").[28]

Indeed, Davis concedes that his purpose behind introducing the CMS Conditions was to support his vicarious-liability theory—that is, to advise the jury that Harris had a right of control over Sundance and Dr. Leitch and therefore could be held vicariously liable for their failure to implement and enforce a medication-handling policy for the anesthesia department. But as shown above, Davis's vicarious-liability theory is invalid under Texas agency law; while Harris may be directly liable for its own failure to formulate and enforce a medication-handling policy that applied to the anesthesia department, it cannot be held vicariously liable

---

[28]As one of our sister courts has pointed out, cases—like those cited here— upholding a trial court's decision to exclude certain regulations under an abuse-of-discretion standard do not show that it would necessarily be an abuse of discretion for a trial court to admit the same regulations in another case with different facts. *See Costilla v. Crown Equip. Corp.*, 148 S.W.3d 736, 740 (Tex. App.—Dallas 2004, no pet.). Although we agree with this general proposition, these cases nonetheless illustrate courts' recognition of the potential danger posed by the admission of such regulations.

for Sundance's or Dr. Leitch's failure to do so. Thus, by admitting the CMS Conditions and allowing Dr. Abookire to rely on them as a basis for her standard-of-care opinions, the trial court created a significant danger that the jury, mistakenly believing that Davis's vicarious-liability claim had the backing of federal law, would find Harris liable based on an invalid legal theory. Because this danger substantially outweighed the regulations' meager probative value, the trial court abused its discretion by admitting them. *See* Tex. R. Evid. 403; *JBS Carriers, Inc.*, 564 S.W.3d at 836.

Davis argues that even if the trial court abused its discretion by admitting the CMS Conditions and related testimony, the error was harmless. We disagree.

First, Davis contends that because Dr. Abookire merely testified that the CMS Conditions made Harris *responsible* for establishing appropriate policies for the anesthesia department, not that they made Harris *liable*, this evidence was not harmful. But this wordplay amounts to legal legerdemain and fails to address the fundamental problem underlying the CMS Conditions' admission. Davis acknowledges that "responsibility" equates with duty. Thus, the CMS Conditions—and Dr. Abookire's testimony regarding them—served to advise the jury that Harris had a duty to control Sundance and Dr. Leitch and that their failure was Harris's failure. Regardless of whether Dr. Abookire spoke in terms of responsibility or liability, the effect was the same—to mislead the jury into believing that Davis's vicarious-liability theory was valid.

Second, Davis argues that the error was harmless because the trial court did not submit his vicarious-liability theory to the jury and because the jury did not find the CRNAs or Dr. Leitch negligent. But the jury charge instructed the jury that "[a] hospital acts through its agents, employees, officers, and representatives, and those are the acts of the hospital." The Committee on Pattern Jury Charges has made clear that this instruction is to be used "when the claim is for the hospital's *vicarious liability* based on conduct of a hospital's agents or employees."[29] Comm. on Pattern Jury Charges,

---

[29]Although the jury charge instructed the jury "not [to] consider the acts or omissions of Robert Bruce Leitch, M.D. in his practice of medicine, Heather Goforth, CRNA, or Vicki Tucker, CRNA" when considering Harris's negligence, this instruction did not preclude the jury from finding Harris vicariously liable for Sundance's or Dr. Leitch's failure to implement and enforce a medication-handling policy for the anesthesia department. First, the instruction did not even mention Sundance or proscribe the jury's consideration of Sundance's acts or omissions when evaluating Harris's negligence. Second, it only prohibited the jury from considering Dr. Leitch's "acts or omissions . . . *in his practice of medicine*." [Emphasis added.] Thus, while this instruction prohibited the jury from holding Harris vicariously liable for Dr. Leitch's negligence, if any, in providing patient care to Angela, it did not preclude the jury from holding Harris vicariously liable for Dr. Leitch's acts or omissions while acting in a policy-making role. Because Davis's theory was not that Harris was vicariously liable for Dr. Leitch's negligent patient care but rather that it was vicariously liable for his failure to implement a medication-handling policy, the instruction not to consider Dr. Leitch's omissions "in his practice of medicine" did not alleviate—much less eliminate—the harm caused by the trial court's error. In any event, given Davis's consistent use of the CMS Conditions to blur the lines that Texas law draws between independent contractors and employees and his argument to the jury that these regulations were "the law," we cannot conclude that even a more robust instruction—one prohibiting the jury from contemplating any of Sundance's or Dr. Leitch's acts or omissions when considering Harris's negligence—would have cured the error. *See Bruton v. U.S.*, 391 U.S. 123, 129, 88 S. Ct. 1620, 1624 (1968) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction." (quoting *Krulewitch v. U.S.*, 336 U.S. 440, 453, 69 S. Ct. 716, 723 (1949) (Jackson, J., concurring))); *Dunn*, 307

State Bar of Tex., *Tex. Pattern Jury Charges: Malpractice, Premises & Products* PJC 50.2 & cmt. (2022) (emphasis added). Thus, there was a vicarious-liability submission through the trial court's instruction. Further, the fact that the jury did not find the CRNAs or Dr. Leitch individually negligent does not render the error harmless. The jury found Sundance negligent and could have imputed Sundance's negligence to Harris. Alternatively, the jury could have found Harris liable because it believed that under the CMS Conditions, Harris was ultimately responsible for the CRNAs' mistake.

Finally, Davis argues that the admission of the CMS Conditions and related evidence could not have caused harm because the jury was not asked a question about whether a duty was owed. But this argument is unpersuasive. It is unsurprising that the jury was not directly asked whether a duty was owed because this is a question of law for the court to decide. *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 503 (Tex. 2017); *Tri v. J.T.T.*, 162 S.W.3d 552, 563 (Tex. 2005); *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). But as Davis himself pointed out during oral argument, a jury's determination as to whether a duty was breached is necessarily informed by its understanding of what the duty is. Clearly, Davis's purpose in offering the CMS Conditions and related evidence was to influence the verdict by impressing upon the jury that Harris had a nondelegable duty to exercise control over

---

F.2d at 886 ("It is better to follow the rules than to try to undo what has been done. . . . [O]ne 'cannot unring a bell[.]'").

its independent contractors; otherwise, there would have been no basis for admitting this evidence. *See W. Union Tel. Co. v. Stiles*, 34 S.W. 438, 438 (Tex. 1896) ("If the evidence is not to influence the verdict, why should it be admitted at all?"). Thus, the mere fact that the jury was not directly asked a duty question did not render the CMS Conditions' erroneous admission harmless.

In sum, there was a significant danger (1) that the jury would mistakenly believe that the CMS Conditions preempted Texas agency law and imposed a nondelegable duty on Harris to provide competent medical care to its patients and (2) that this mistaken belief would cause the jury to find Harris liable based on an invalid legal theory. Because this danger substantially outweighed the regulations' slight probative value, the trial court abused its discretion by admitting the CMS Conditions and the testimony concerning them. *See* Tex. R. Evid. 403; *JBS Carriers, Inc.*, 564 S.W.3d at 836. Further, because this erroneously admitted evidence was crucial to a key issue, we conclude that it was harmful. *See Reliance Steel & Aluminum Co.*, 267 S.W.3d at 873. Indeed, because we cannot—in light of the jury charge's vicarious-liability instruction—determine whether the jury based its negligence finding against Harris on a valid legal theory, we must conclude that harm is present. *Cf. Cortez ex rel. Estate of Puentes v. HCCI-San Antonio, Inc.*, 159 S.W.3d 87, 91 (Tex. 2005) ("[W]hen a jury bases its finding on an instruction that 'commingles invalid theories of liability with valid theories,' we do not hold the error harmless because the most that a reviewing court

can say is that the verdict might have been reached on a valid theory." (quoting *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000))).

Accordingly, we sustain Harris's first issue.

## IV. CONCLUSION

Having sustained Harris's first issue and overruled its second issue, we reverse the trial court's judgment and remand this case for a new trial. Given our disposition of Harris's first two issues, we need not—and therefore do not—address the parties' remaining issues. *See* Tex. R. App. P. 47.1.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: August 1, 2024

56